**OHIO DRILL & TOOL CO. et al.,**
**Plaintiffs-Appellants,**

v.

**Fred H. JOHNSON et al., Defendants-Appellees.**

**No. 73–1903.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 11, 1974.

Decided June 12, 1974.

Lyman Brownfield, Columbus, Ohio, for appellants; Laurence E. Sturtz, Brownfield, Kosydar, Bowen, Bally & Sturtz, Columbus, Ohio, on brief.

Thomas J. Moyer, Columbus, Ohio, for appellees; Crabbe, Brown, Jones, Potts & Schmidt, Charles E. Brown, Columbus, Ohio, on brief.

Before CELEBREZZE, McCREE and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This is an appeal from a judgment of the district court in which all but one of several claims in the plaintiffs' stockholders' derivative action for the benefit of an Ohio corporation, Fidelity National Life Insurance Company, against certain of its officers and directors, were denied.

The defendants, Johnson, Woodward and Zink, directors of the Corporation, were also, respectively, the President, Vice President and Legal Counsel of Fidelity.[1] Plaintiffs allege violations by defendants of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j, and Rule 10(b)(5), promulgated thereunder as well as certain state laws.[2]

Defendant Johnson was involved in several challenged activities. In 1966, he received from Fidelity 4,300 shares of Fidelity stock as compensation for services rendered. Shortly thereafter, he sold the shares of stock back to Fidelity for $34,000.00. The district court found that:

> While this transaction was apparently never disclosed to Fidelity's

stockholders, no evidence has been presented that Mr. Johnson received anything more by way of remuneration than he was entitled to. Nor does it appear from the evidence that any person other than the corporation itself realized profit from the open market resale of Fidelity stock.

Plaintiffs' claim is that this transaction was a short swing sale in violation of Ohio Revised Code § 3901.31(B).

Johnson was also a director and part owner of MacJay Enterprises, Inc. Pursuant to authorization by its board of directors, Fidelity entered into a five-year lease agreement with MacJay in which it sublet office space. A part of the profits realized from this lease presumptively went to Johnson, apparently without the knowledge of Fidelity's directors or stockholders. Plaintiffs urge that the failure of Johnson to disclose fully his interest in the lease is a sufficient legal ground to require disgorgement of his profits to Fidelity under Ohio common law.

Johnson, Woodward and Zink were involved in challenged activities arising from the formation of Fortune National Life Insurance Company and alleged proxy non-disclosures, both of which will be discussed hereafter.[3]

Woodward, the plaintiffs contend, made substantial profits by means of short swing sales of Fidelity stock from 1965 until his resignation as an officer some years later. The court below found that:

> There is evidence in the record that Woodward did engage in repeated

---

1. Other directors and officers, originally named as defendants, were dismissed from the action after the claims against them were compromised and settled.

2. Actually there are four specific allegations of violations of state law. Two of the allegations concern violations of state statutes that are virtually verbatim reproductions of sections of the Securities Exchange Act, i.e., Ohio Revised Code, Section 3901.31(D), is modeled after Section 14(b) of the Securities Exchange Act, and Ohio Revised Code, Section 3901.31(B) is modeled after Section

16(b) of the Act. In light of these substantial similarities, federal precedent is helpful in interpreting the state statutes in the absence of Ohio case law.

3. The plaintiffs also allege misconduct by Johnson in selling Fidelity all of its insurance, such as bonds, casualty, liability and automobile coverage, without proper disclosure. The district court did not treat this issue nor do the plaintiffs make more than passing reference to it in their brief. Therefore, we do not consider this on appeal.

purchases and sales of Fidelity stock (Plaintiffs' exh. 42). However, he always maintained a large reserve of stock held for more than six months. It is impossible to ascertain from exhibit 42 what amount of stock, if any, was held on a short-term basis. Furthermore, in May of 1970, during a proxy fight, Mr. Woodward gave to the Fidelity Board of Directors an accounting of his Fidelity stock transactions over a two year period, it was determined that a profit of $873.63 had been realized, and payment of such amount was accepted as "a complete release to Mr. Woodward on profits resulting from short swing transactions in shares of the [sic] corporation." (Plaintiffs' exh. 17, Minutes of May 7, 1970).

Defendant Zink, while a director and legal counsel for Fidelity, was also an insurance broker. He was the exclusive agent of record for AMVETS (American Veterans of World War II and Korea). In this capacity, he placed the business of AMVETS with Fidelity for which he received a commission. The AMVETS insurance contract, though it generated a positive cash flow, was, in the words of the district court, "in all likelihood, not a profitable business." Fidelity divested itself of the AMVETS contract in 1971. The plaintiffs urge that Ohio Common Law requires disgorgement of the profits made by Zink because of a lack of complete disclosure of his involvement in the AMVETS contract.[4]

During 1965 and 1966, Fidelity and some of its directors and officers sought to expand the company's insurance business beyond Ohio into adjoining states. To this end, the Fortune National Life Insurance Company was organized in Pennslyvania for operation in that state since Fidelity could not legally qualify for a license to do business in Pennsylvania. The defendants, Johnson, Zink and Woodward, were prime movers in the promotion and organization of Fortune. To enable them, together with other directors, and other investors, to invest in stock of the Pennsylvania corporation, the defendants caused to be formed Central Investment Company.[5] The corporate records of CIC were kept at least a part of the time, at the Fidelity offices. Fidelity did not invest directly in Fortune, but the Board of Directors apparently authorized an investment by Fidelity of $40,000 in CIC. This amount was later reduced to $34,000.[6]

In the organization of Fortune, 300,000 shares of founders' stock were authorized to be sold at $1.50 per share. 88,700 of these shares were acquired by CIC, of which 21,485 shares were to be distributed by Fidelity.[7] CIC also received 25,000 warrants to purchase Fortune stock at $5 a share. When in 1966 the stockholders of CIC voted to dissolve the corporation, the warrants were distributed to investors. Although there was some unequal distribution of the warrants, this matter is not before us on the present appeal as the district court's order concerning the distribution of warrants to plaintiffs was not appealed. In the distribution of the Fortune shares of stock, the plaintiffs complain,

---

4. The plaintiffs also urge that Zink while a member of Fidelity's Investment Committee, sold Fidelity policies to his clients and obtained loans from corporate funds for them without full disclosure. The district court did not address itself to this issue and the record does not reveal any proffer of proof that there was less then full disclosure of the transactions or that these transactions were not executed in the normal course of business.

5. C.I.C. was organized on advice from Fidelity's legal counsel, the defendant Zink, that

O.R.C. Sec. 3907.14(R) prohibited Fidelity from investing directly in Fortune's stock.

6. This was an attempt to bring the amount of Fidelity's investments within the maximum limits allowed for such investments by Ohio law.

7. The defendants in addition to organizing Fortune also participated in the investment. The district court's memorandum goes into each defendant's involvement in intricate detail. We find it unnecessary here to enter into an exact computation of each defendant's interest.

however, that there was a disparity of treatment as between Fidelity and the individual investors. Plaintiffs would have received 1,086 more of the Fortune shares, it is insisted, if the distribution to it had been on the same proportional basis per cash investment as the distribution to individual investors.[8]

During the planning and organizational stages of the Fortune venture the expenses for travel, incorporation, attorney's fees and the lease of office space, were paid by Fidelity and later reimbursed by Fortune without interest. The defendants also made use of Fidelity's executive time and overhead that, according to the district court, was not billed to Fortune.

The plaintiffs seek to require the defendants to disgorge for the benefit of Fidelity all profits made by them on the Fortune transaction.

Finally, plaintiffs allege that the proxy statements mailed to the stockholders of Fidelity by the directors failed to disclose material information relative to the challenged activities of the defendants. The district court found this allegation "in the main true," but denied any relief.

From this somewhat involved factual situation, five issues are raised on appeal.

The plaintiffs, seeking disgorgement of the profits made by the defendants on the Fortune transaction under Rule 10(b)(5) liability,[9] urge that the district court applied the wrong standard of damages in denying recovery. The district court held that the measure of damages in a stockholders' derivative action is limited to out-of-pocket losses suffered by the corporation. Since Fidelity actually made a profit on the venture there was, according to the district court, no damage. We disagree.

The proper standard of damages for either a defrauded seller or buyer under Rule 10(B)(5) is "disgorgement of profits." In Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. den., 392 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), a seller's action under Rule 10(B)(5) to recover the buyer's profits, the court awarded the defrauded party the benefit of the defendant's bargain. The court stated:

> [T]here can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them. . . . *[I]t is simple equity that a wrongdoer should disgorge his fraudulent enrichment.* [Emphasis added.] Id. at 786.

Both *Janigan* and a similar case, Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), were cited with

8. At oral argument, there was some confusion as to the plaintiffs' claim concerning the founders' stock. For the sake of clarity we note that the plaintiffs' argument that Fidelity received 1086 fewer shares of Fortune's stock than it was entitled to receive and their argument concerning the disparity in the price paid for founders' stock ($1.591 per share for Fidelity as opposed to $1.515 per share for each defendant) are in effect one and the same. Each is a different way of expressing the same charge—that the defendants profited on the issuance of the shares to the detriment of Fidelity.

9. Section 10(b) of the Securities Exchange Act does not by its terms make unlawful any conduct or activity, but confers rule making power on the S.E.C. to condemn deceptive practices in the sale or purchase of securities. Rule X–10B–5, which was promulgated by the S.E.C. pursuant to this authorization, provides: "It shall be unlawful . . .

"(a) To employ any device, scheme, or artifice to defraud

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

approval by the Supreme Court in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Although *Janigan* was concerned with the disgorgment of profits remedy to the defrauded sellers, a recent Second Circuit case, Zeller v. Boque Electric Mfg. Corp., 476 F.2d 795 (2d Cir. 1973),[10] extended the disgorgement remedy to defrauded buyers. In so doing, the court stated:

> We do not consider the cited cases, or our own decision in Levine v. Seilon, Inc., *supra*, 439 F.2d at 334, as having established any such bright line between defrauded sellers and defrauded buyers as defendants urge. . . .
> The reason why the remedy has been applied for the benefit of defrauded sellers but not of buyers is not any decisive legal difference but the difficulty generally confronting the defrauded buyer in showing that the fraudulent seller has in fact reaped such a profit. Id. at 801–802.

The district court made no specific findings as to fraud in the Fortune transaction, laboring under a misapprehension with respect to the proper standard of damages. Its error in its determination as to the law on this issue, tainted its findings of fact. In consequence, the action must be remanded for a determination as to whether there was a Rule 10(B)(5) fraud in the Fortune National transactions. If such fraud is found, then the court must reconsider the question of damages in light of this opinion.

The plaintiffs also urge that under Ohio common law the district court should have impressed a constructive trust on any actual profits realized by the defendants on the Fortune transaction, including interest on Fidelity's money and the value of the use of Fidelity's executive time and overhead used in the formation of Fortune.

Clearly, directors who violate their fiduciary duty to the corporation are liable under Ohio law for any profits resulting from the breach.[11] In Marcus v. Otis, 168 F.2d 649, 654 (2d Cir.), modified 169 F.2d 148 (2d Cir. 1948), a case helpful to our analysis even though the facts are distinguishable from the case at hand, Judge Learned Hand observed:

> Plainly the defendants violated their duty as directors, when they converted the company's funds to buy their shares, and, like any other fiduciaries, they made themselves liable for all profits. That is so fundamental a doctrine as to fiduciaries of all sorts, that it is somewhat surprising to find it questioned. . . . The wrong is much simpler and more fundamental—the misappropriation of funds—and it is neither an excuse that they later repaid what they had taken, nor that they allowed "Automatic" to buy 25,000 shares at 57 cents. The bargain was voidable from the outset, no matter how favorable the terms might be, and "Automatic" can follow and reclaim the abstracted funds in any form they may take, however enhanced in value.

The district court, though making extensive findings of fact concerning the Fortune transaction, made no findings as to the breach of their fiduciary duty by the

10. The defendants seek to oppose the plaintiffs' contention for Sec. 10(b) damages by citing Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. den. 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). This case is only helpful in determining that fraud not "in connection with" the purchase or sale of securities is not a violation of Sec. 10(b).

11. In Nienaber v. Katz, 69 Ohio App. 153, 43 N.E.2d 322 (1942), an Ohio court cited Ohio Jurisprudence as authority for disgorgement of profits to the corporation in an appropriate case.

> Any secret profit obtained by an officer or director by reason of violation or disregard by him of obligations arising by reason of fiduciary relations existing between him and the corporation, cannot be retained, but must be accounted for to the corporation. 10 O.Jur. 704, § 519.

defendants in that transaction.[12] Such findings must be made on remand before the district court can determine whether the defendants should be impressed with a constructive trust. It matters not that Fidelity suffered no loss if the directors breached their duty and profited from it.

■ The plaintiffs allege that the defendants were elected directors through the use of misleading proxy statements in violation of O.R.C. Section 3901.-31(D). In addressing itself to this allegation, the district court stated:

> In the nature of a capsule summary, it is alleged finally by plaintiffs that proxy statements mailed to Fidelity shareholders during the years in question failed to disclose material information relative to each of the abuses claimed above: Zink's status as insurance broker and the commissions he received on the Amvets contract; the results of the Amvets program; Woodward and Johnson's stock transactions in Fidelity shares; Johnson's alleged conflict of interest in the MacJay Enterprises transaction; and the participation of the three defendants in the promotion of Fortune and CIC. These allegations are, in the main, true. Information relating to these transactions was not disclosed in any proxy materials until about 1970, when dissidence began to develop among a minority of Fidelity's shareholders and disclosures were made.

After making these findings, the district court ruled against the plaintiffs on the proxy issue as a matter of law—holding that to be recoverable, losses must be shown to have resulted from non-disclosure. This too is a misapprehension of the law.

In Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Supreme Court in construing Sec. 14(b) of the Securities Exchange Act seemed less impressed by the result of the non-disclosures than by their materiality. The district court's holding that the plaintiffs must show a causal relationship between the nondisclosures and the defendants' election to office in addition to demonstrating the materiality of the non-disclosures would constitute a blow to proxy disclosure rules. As the Supreme Court stated in *Mills*:

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. Id. at 385.

■ The question of causation aside, the district court's disposition of this issue is correct in result. The typical remedy for elections of directors pursuant to materially misleading proxy statements is injunctive relief suspending or setting aside the tainted election. This remedy is not available here since Fidelity as a corporation is no longer extant, having been merged into the American Financial Corporation. The plaintiffs urge that disgorgement of the profits

---

12. In Seagrave Corp. v. Mount, 212 F.2d 389, 397 (6th Cir. 1954), this Court in considering the extent to which equity will go in upholding a fiduciary obligation stated:

Although good faith on the part of the directors and the disclosure of the material facts eliminate the question of actual fraud, equity will still act to enforce the fiduciary obligation under circumstances amounting to constructive fraud. Constructive fraud refers to acts which may have been done in good faith, with no purpose to harm the corporation, but which are done by one who has placed himself in a position of conflict between a fiduciary obligation and his own private interest. In such a situation, by reason of the strict rule applicable to fiduciaries, equity will take appropriate action to prevent the harm resulting from such actions, regardless of the good intentions of the fiduciary. Levitan v. Stout, D.C.W.D.Ky., 97 F.Supp. 105, 117; Epstein v. United States, 6 Cir., 174 F.2d 754, 765-766; Hyams v. Calumet & Hecla Mining Co., 6 Cir., 221 F. 529, 542-543, 137 C.C.A. 239.

from the nondisclosed activities would be an appropriate remedy for proxy violations. We think not. The defective proxy statements may have resulted in the election of the defendants as directors but to apply a standard of damages that is similar to that applied in Rule 10(B)(5) fraud cases to proxy violations, merely because the normal remedy is not available, seems unsupported in precedent and logic. If a court is to look beyond the ordinary remedy in these cases, the district court's out-of-pocket losses standard seems broad enough "to provide such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964).

■ A further significant issue on the present appeal is whether the district court erred in not finding that Johnson and Woodward were involved in short-swing sales in violation of Ohio Revised Code Sec. 3901.31(B). As to Johnson, the district court's findings of fact make it clear that he received shares of Fidelity stock as compensation for services rendered and then changed his mind, preferring to receive his compensation in cash. Unfortunately for Johnson, when the stock shares were issued in his name, he could be said to have purchased them with his services. When he returned them to Fidelity for cash, he was selling them. Under the federal interpretation of Sec. 16(b), the occurrence of the purchase and sale within a six-months period constitutes an illegal short swing sale.[13] Sec. 16(b) establishes a clearly fixed rule of disgorgement of profits when an insider purchases and sells or sells and purchases securities of the corporation of the same class within six months, in order "to insure the optimum prophylactic effect." Bershad v. McDonough, 428 F.2d 693, 696 (7th Cir. 1970).

■ To be required to disgorge the profits one must have realized a profit. The district court found that "no evidence has been presented that Mr. Johnson received anything more by way of remuneration than he was entitled to." In light of the district court's general "out-of-pocket" approach to damages, we believe that this finding is insufficient as a basis for determining the existence of liability for short-swing sales. On remand, the district court must determine if Johnson profited from the transaction. If he did, the remedy is clear.

■ As to Woodward, the district court denied any short-swing sales liability because Woodward maintained a large reserve of stock that had been held for more than six months, thus making it "impossible" to ascertain from the exhibits "what amount, if any, was held on a short term basis."[14] This holding

---

13. We should be vigilant to avoid the mechanical application of technical rules. As the court in Petteys v. Butler, 367 F.2d 528, 533 (8th Cir. 1966), stated:

There is, however, a very different and difficult problem when a transaction falls within the literal boundaries of the Act, by giving a broad interpretation of the definitions of purchase as "any contract to buy, purchase or otherwise acquire," 'and sale as "any contract to sell or otherwise dispose of," yet due to the particular factual situation which makes unfair speculation impossible it is clearly beyond the' Act's preventive purposes. In that situation the question arises, should the Act be literally applied without further inquiry and without regard to the purposes, or should the broad and arbitrary rules be applied only to situations which are capable of the abuse that the statute was designed to prevent? We believe that each case must be examined on its own facts and the Act only applied when these facts disclose the possibility of abuses that the Act were [sic] designed to prevent.

Despite the somewhat unusual circumstances of Johnson's transaction the potential for abuse of the interest the statute sought to protect is present. Whether there was actual abuse is not material. Therefore, finding a short swing sale violation by Johnson is not a blind application of the rule.

14. Woodward paid to the Board of Directors $873.63 for a complete release on profits "resulting from short swing transactions in shares of the corporation." The district court mentioned this settlement in its memorandum opinion. The defendants urge that this ends all consideration of Woodward's liability on the short swing sales. We disa-

seems to disregard the language of the statute: ". . . any profit realized . . . from . . . any sale and purchase, of any equity security of such company within . . . six months," Ohio Revised Code Sec. 3901.31(B) (language identical to Sec. 16(b)). An insider cannot obviate the purposes of the statute by the form of the transaction. In Petteys v. Butler, 367 F.2d 528, 532 n. 3 (8th Cir. 1966), the court stated:

> Although it is not clear whether the shares sold were the same certificates acquired in the conversion, this point is immaterial. Equity securities are treated as fungible items. "[S]ince all shares of a corporation's stock are alike and interchangeable, it is of no consequence whether those bought and sold are represented by the same certificates." Walet v. Jefferson Lake Sulphur Company, 202 F.2d 433, 434 (5th Cir. 1953), cert. denied, 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346.

The courts recognize the broad remedial purposes behind this section. When a transaction has potential for abuse by an insider, the rule is liberally construed without regard to good faith. e. g., Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. den. 320 U.S. 751, 64 S. Ct. 56, 88 L.Ed. 446 (1943). The dis-

trict court's concern over which specific shares of stock were sold is misdirected. The state statute would be emasculated if an insider were allowed to purchase a large reserve of stock in one's own corporation, hold the shares for a period of time longer than six months, and then buy and sell additional shares of the corporation's stock in a speculative manner without regard to any time limit, as long as the number of shares held in reserve never dropped below the number held for more than six months.[15] Thus the district court's determination that Woodward's transactions did not constitute short-swing sales is erroneous. On remand, the district court must determine the amount of profit realized by Woodward in short-swing sales.[16] The proper guidelines for this determination were enunicated in Western Auto Supply v. Gamble-Skogmo, Inc., 348 F.2d 736, 742–743 (8th Cir. 1965):

> The issue is also raised that no one actually profited from the purchase of the shares transferred to the Trust Fund. True, these identical shares were not sold, but the segregation of the shares is not permissible under § 16(b). On the contrary, a proper construction of § 16(b) requires that purchases and sales be matched arbitrarily so as to disgorge the insider of a maximum profit under a rule of

gree. The transaction was made during the 1970 proxy fight that brought many of the questioned activities of the defendants to the fore. This fact, coupled with the plaintiffs' computation of the profits shown in exhibit 42, of $13,774.65, indicates that this "arms length transaction" is at least suspect, with a heavy presumption against its validity.

15. The Eighth Circuit enunciated the same reasoning in Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 743 (8th Cir. 1965):
> Shares of stock are fungible and each certificate denotes identical rights. [citations omitted] The segregation or matching of stock certificates cannot be countenanced without scuttling the remedial effects of § 16(b). To do otherwise would open wide the door for easy evasion of the purpose of the Act which the court in the Gratz case, supra, at 51, indicated was to treat short swing transactions and shares

of stock indiscriminately as " * * * sales and purchases, or purchases and sales, of gallons of oil in a single tank, or of bushels of wheat in a single bin, * * * the ascertainment of the particular shares bought or sold must be wholly irrelevant."

16. Because of the district court's misapprehension of the law of short swing sales, it did not find it necessary to give full treatment to the defendant Woodward's defense to the short swing sales liability. Nothing in this opinion is to be construed as preventing the court below from fully exploring the merits of the short swing sales liability in light of any defenses offered by Woodward. In note 14 we only indicate that the existence of the release, in light of the circumstances of the case, is not sufficient to defeat the plaintiffs' claim in the absence of proof, greater than presently appears in the record, to rebut the heavy presumption of invalidity.

lowest-price in and highest-price-out within six months, regardless of any intent with respect to a particular purchase or sale, and without limitation to a specific stock certificate. This rule was first enunciated in Smolowe v. Delendo Corp., *supra*, 136 F.2d at 237.

 The plaintiffs also assert that the district court erred in not applying Ohio's self-dealing rule to Johnson's McJay lease transaction and to Zink's AMVETS insurance contract transaction. As mentioned earlier in connection with the Fortune transactions, the law is clear that directors who violate their duties as fiduciaries are liable for any profits resulting from such a breach. However, unlike the Fortune transaction, concerning which the district court made no findings as to breach, the lower court held the neither Johnson nor Zink breached a duty owing to Fidelity in regard to the MacJay and AMVETS transactions. The distinction was justified on the ground that the latter were fair and sound business dealings for Fidelity.

The district court's opinion reflects that it placed the burden of proving breach of the fiduciary duty on the plaintiffs—normally the place where the burden would belong. However, in this case, there was proof of non-disclosure to the stockholders of Fidelity and only partial disclosure to the directors of Johnson's and Zink's involvement in the two transactions. Had the directors' self-interest been apparent for all interested parties to see, the plaintiffs would be required to carry the burden of proving breach of duty. Non-disclosure under the circumstances of this case, we believe, shifts the burden of proof on the issue of fiduciary duty to the defendants. In Nienaber v. Katz, 69 Ohio App. 153, 158, 43 N.E.2d 322, 325 (1942), the Ohio court stated:

> The officer owes a certain duty to the corporation and it is his failure to perform that duty to his own enrichment that creates the liability. The

secrecy is simply the cloak under which he has hidden his failure of duty and the personal profit he has thereby made.

Thus, when a cloak of secrecy is raised concealing the self-dealing transactions, the directors must prove that nothing is amiss behind the shield.

On remand, the district court must once again determine the propriety of the AMVETS and MacJay transactions. However, because of their failure fully to disclose these transactions, the defendant will have the burden of proving that they did not violate their fiduciary duty to Fidelity. If they did, as indicated earlier, disgorgement of profits is the proper remedy.

Accordingly, the judgment of the district court to the extent herein indicated is vacated and the action is remanded to that court for further proceedings consistent with this opinion.