Betty Jane SIEBEL, Executrix of the Estate of Eldon K. Siebel, Deceased, et al., Plaintiffs-Appellants Cross-Appellees,

v.

James C. SCOTT, et al., Defendants-Appellees Cross-Appellants.

No. 82–1713.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1984.

Carl A. Generes, John O. Cunningham, Richard C. Guinan, Jr., Dallas, Tex., for plaintiffs-appellants cross-appellees.

Tom Thomas, Dallas, Tex., for defendants-appellees cross-appellants.

Before GEE, TATE and PATRICK E. HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this securities case we review findings that sales of securities were procured by fraud and we explicate the proper measure of damages for such cases. We hold that interests in a limited partnership here constitute "securities," and that the plaintiffs' recovery on the facts here should be tied to the actual value of the partnership interests at the time of sale which can encompass the profit realized by the fraudulent purchaser

upon subsequent resale of the underlying assets. We affirm the district court's findings of fraud, but remand for application of the proper measure of any injury.

## I

Plaintiffs[1] are seven of eleven former limited partners in Cable TV of Lebanon, Ltd., a limited partnership formed to own and operate a cable television system in Lebanon, Missouri. Communication Systems, Inc., a wholly owned subsidiary of Jim Scott and Associates was its general partner. Both corporations were controlled by James C. Scott. The limited partners charge that CSI, JSA and Jim Scott fraudulently induced them to sell their partnership interests in Cable TV of Lebanon to JSA, which placed the cable TV assets into a new limited partnership, and sold its shares at a large profit. The selling partners seek disgorgement of this profit.

Cable TV of Lebanon was formed in 1974. Eleven limited partners each contributed $5,500 which the partnership used along with two bank loans to purchase the cable television equipment. The partnership then leased this equipment to CSI which took responsibility for operating the cable television system. The lease provided for a fixed monthly rental over a ten year term after which CSI would have an option to purchase the assets of the partnership at 30% or 18% of market value, for CSI stock or cash, respectively. During the lease term, CSI was obliged to absorb all of the expenses of operating the television system.

In the spring of 1978, Jim Scott called a meeting of the partnership to discuss changing competitive conditions that were threatening the profit of its cable system. Three limited partners attended the meeting which was held on May 4, 1978. They learned from Scott that due to the move of a broadcast facility in Springfield, Missouri, residents of Lebanon were now able to receive programming from the three commercial networks as well as public television, greatly decreasing the need for cable televi-sion services. Scott explained that the cable television system needed general upgrading and expansion, and to remain competitive it would need to install an earth receiving station which could provide a broad variety of television programming.

Scott told the limited partners that the improvements he envisioned would require substantial new capital. Scott also explained that these new capital improvements would not provide the tax benefits their original investments had won for them. Scott informed the limited partners that they had a choice either to invest more funds in the cable system or to sell their interests in that system back to JSA. Scott insists that he also informed the partners that they had the option of doing nothing and holding CSI to the terms of its ten year lease with the partnership. This testimony was controverted and the district court found that Scott did not in fact inform the partners of this option. Indeed the record supports a reasonable inference that Scott tried to persuade the limited partners that their investment had soured and that they were fortunate for an opportunity to sell out to JSA. He also omitted to tell the limited partners of his plans for the cable system following their sale to him. Each partner was offered $5,274 for his partnership interests. Though this sum was only slightly less than the $5,500 that each partner had originally invested, most of this money ultimately was paid in federal income taxes for recaptured accelerated depreciation deductions taken by the partners on the cable system's assets.

Following the meeting with the three limited partners, Scott contacted all but one of the remaining partners and gave them a briefer version of the presentation he had made at the meeting. Each was told of the cable system's financial troubles, and each was encouraged to sell his interest in the partnership to JSA. None were told that they could hold CSI to its obligations under the lease with the partnership. The record permits the inference that several of the

---

1. We summarize the facts supportive of the district court findings and do not summarize conflicting evidence unless necessary to context.

partners were led to believe that each was the sole remaining partner who had not yet agreed to sell his partnership interests to JSA.

When all partners had sold, JSA terminated the Cable TV of Lebanon partnership. JSA then transferred the cable television assets into a new partnership also named Cable Television of Lebanon, Ltd. A group of investors paid a total of $595,-000 in cash for shares in this second limited partnership. The partnership then gave JSA a note for $1,350,000 in payment for the cable television assets. Of this sum, $800,000 was guaranteed by the limited partners. Once again CSI served as general partner.

This suit followed. In sum, the limited partners from the first partnership sued Scott, JSA, and CSI, claiming that as a result of Scott's fraudulent conduct these defendants were able to reap a windfall by purchasing the cable television system from the first partnership for an aggregate of approximately $232,000 in cash and assumed loans, thereafter selling the same assets to the second partnership for $1,350,-000. The plaintiffs sought disgorgement of this alleged windfall profit. After a bench trial the district court held that Scott had engaged in misrepresentation and fraudulent conduct and had thereby impelled the limited partners to sell their partnership interests to JSA. In particular, the court found that Scott had not informed the limited partners that if they did not want to sell out they were free to hold CSI to the terms of its ten year lease with the partnership. In accordance with this finding, the district court held that the damages suffered by the partners was the loss of the rental payments they would have received had the lease continued to the end of its term. The limited partners were awarded slightly over $60,000 in actual damages, the aggregate sum payable over the remaining term of the lease, with $50,000 in punitive damages and $50,000 in attorney's fees.

The limited partners appeal from the damage verdict. Agreeing with the finding of misrepresentation and resultant liability, they insist that defendants should have been ordered to disgorge the "entire" profit of slightly over $1,000,000. Defendants also appeal, challenging the finding of liability and insisting that investors were dealt with fairly, had no material facts misrepresented to them, and received a fair price for their partnership interests.

## II

The selling limited partners stated claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, presenting the threshold question of whether the limited partnership interests were "securities." We hold that these interests were securities in the hands of the sellers, and that a § 10(b) action was maintainable for fraud in connection with their sale.

The concept of "security" found in the securities laws "is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S.E.C. v. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). An "investment contract" may take many forms dissimilar to traditional stocks, bonds, or debentures. "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104; *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 851–53, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

In their hands, the interests of the limited partners pass this test. There is no evidence that any of the limited partners planned or desired to participate in the operation of the cable television system. The limited partners viewed themselves as investors the securities laws were designed to protect: they paid their money and relied on the managerial skills of the general partner to bring profit through both the lease payments and the ultimate sale of the assets after the lease term. A sale and lease-back arrangement essentially identical to

this one was recently held by the Ninth Circuit to constitute a security in the hands of the limited partners, *United States v. Jones,* 712 F.2d 1316, 1321–22 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983).

But, Scott counters, the present transaction was not a purchase or sale of securities because the net effect of the sale to JSA of all the limited partnership interests was to transfer to the purchaser the assets of the cable television system rather than any interest that could be characterized as a security. The limited partners reply that this circuit does not accept the "sale of business" doctrine.

The reply misapprehends the application of the doctrine. In *Daily v. Morgan,* 701 F.2d 496 (5th Cir.1983), we held that ordinary corporate stock does not lose its character as a security, even when its owner is also the entrepreneur controlling the venture and therefore is not relying on the managerial skills of another for his profit. Thus, a sale of all the stock of a corporation is a purchase and sale of securities despite the economic reality that the sale transfers business assets from one entrepreneur to another with neither the purchaser nor the seller dependent upon the managerial skill of another. *Accord, Golden v. Garafalo,* 678 F.2d 1139 (2d Cir.1982); *Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979).

Some circuits have endorsed the "sale of business" rule, holding that even ordinary stock loses its character as a security if it reifies the interest of an entrepreneur rather than an investor, *King v. Winkler,* 673 F.2d 342 (11th Cir.1982); *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Chandler v. Kew, Inc.,* 691 F.2d 443 (10th Cir.1977). These courts perform a *Howey-Forman* analysis regardless of the form taken by the putative security, whereas courts rejecting the "sale of business" rule will not perform that analysis when the security takes a "traditional" form such as ordinary corporate stock. All courts agree, however, that a *Howey-Forman* analysis is required when the interest takes the form of an "investment contract" or an "instrument commonly known as a 'security'"; that was, after all, the precise holding of these Supreme Court cases. It is plain, then, that our rejection of the "sale of business" rule for corporate stock is of no assistance to the investors here, whose interests, if they are securities at all, are best described as investment contracts.

We agree perforce that the partnership interests were not securities in JSA's hands; JSA certainly was not relying on another's managerial skills for its profit. However, it is not necessary that an interest be deemed a security in the hands of both the seller and the purchaser.

The characterization of an interest as a security or not can vary with the relationship of its holder to the venture. If the interest takes the form of an investment contract, *Howey* teaches that it is a security only if the holder is relying on the managerial skills of others to generate his profit. By implication, if the holder is relying on his own entrepreneurial talents to generate his profit, his interest is not treated as a security because he does not fall within the class of persons Congress meant to protect when it included non-traditional securities in the coverage of the securities laws. *Cf. Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982) (drawing a line of demarcation between "investors" and "entrepreneurs," and applying this distinction in a case involving sales of ordinary stock, in keeping with the Seventh Circuit's adherence to the sale of business rule). Here, the limited partners were relying, right through to the moment of sale, on Scott's entrepreneurial efforts for any profit from their investments in the cable television system. The partnership interests changed character only at the moment of sale, and we deem the transaction a sale of securities though not a purchase of securities. Consequently, the sellers are entitled to maintain this suit under the Securities Exchange Act. Otherwise stated, transactions involving the sale of an interest in a venture which is a securi-

ty because it is an investment contract can be Janus-faced—simultaneously looking toward and away from status as a security.

### III

 A claim under § 10(b) requires material misrepresentation, scienter, reliance, diligence, and injury. *See Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The findings that Scott deliberately misrepresented the options available to the limited partners, misrepresented his planned use of the cable television assets should the partnership terminate, and falsely represented to several limited partners that each was the last one deciding to sell out to JSA are not clearly erroneous,[2] and supply the first two elements of a § 10(b) violation.[3]

Similarly, the district court's finding of reliance by the limited partners on these misrepresentations is not clearly erroneous.[4] Though the partners articulated differently their individual reasons for selling their interests in Cable Television of Lebanon, we cannot find clearly erroneous the findings that Scott's efforts to induce a sale were material. When a deceiving purchaser casts his net broadly and hauls in every fish, the reliance element in § 10(b) is inferable if it appears that no plaintiff planned to sell his security before the defendant undertook fraudulently to induce the sales.

 While the question is a close one, we are also satisfied that the district court did not err in concluding that the limited partners exercised all the diligence required of them by the Securities Exchange Act. In *Dupuy,* 551 F.2d at 1016–20, we explained at length that only a gross departure by an investor from the standard of due care will deny him recovery under § 10(b). The investors here put their faith in Scott to represent their best interests and to deal with them fairly and truthfully. The requirement that a plaintiff exercise due diligence is not applied stringently. While incentives born of self interest ought not be discouraged, a more exacting application will only reward the wily defendant who discourages such a questioning attitude. Nothing that Scott told the limited partners in procuring these sales was so inherently

**2.** Scott claims that the district court's findings must be clearly erroneous with respect to one plaintiff who testified that Scott informed the limited partners at the meeting that they had the option of holding CSI to its lease. Scott's argument is that this testimony was an admission and that the trial court cannot make a finding with respect to that party which contradicts that admission. We disagree. The parties entered into no stipulation concerning the discussions at this meeting, and the district court was charged, in the face of conflicting testimony, with making a single finding as to the statements there made by Scott. There was no evidence that Scott made any statements to any of the individual partners not made to the entire group. Accordingly, the trial judge had to determine which of the partners was mistaken in recalling whether or not Scott had told them that they could hold CSI to its lease, and we sustain his implicit finding that the mistaken partner was the one who thought he recollected hearing this statement made.

**3.** We qualify this holding with respect to plaintiff Dr. Rodney Moore. Moore testified, congruently to Scott's testimony, that Scott never contacted Moore as he contacted the other partners to discuss the problems facing the cable system. The first Moore knew of this affair was when one of Scott's employees delivered a check to him for his partnership interest and told him, truthfully, that all the other limited partners were selling their shares. Thus if liability here turns on any affirmative misrepresentation made to the partners, Moore cannot recover because he never heard any misstatements, either directly from Scott or indirectly from his fellow partners. If, however, liability turns on Scott's omission of material facts, Moore is also entitled to recover for any injury. *See* note 4, *infra.* This determination is for the district court on remand.

**4.** Where, as here, an investor is induced to sell his securities as a result of the buyer's omission of material facts, the required showing of reliance takes a different stance. The Supreme Court noted in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), that in a case such as this, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."

implausible that they were under a duty to investigate further.[5]

## IV

The main fight here is over injury. The limited partners charge that Scott induced them to sell their interests at an artificially low price, and promptly repackaged and resold the cable system to a second partnership, reaping a windfall profit in the process. Scott responds that the partners were paid a fair price for their interests and that any profit in the resale was attributable solely to his entrepreneurial efforts.

■ Where all the elements of a § 10(b) violation are proven, "[t]he proper measure of damages to reflect the loss proximately caused by the defendant's deceit is the out-of-pocket rule. That rule is the traditional measure of damages in a Rule 10b–5 action...." *Huddleston v. Herman & Mac-Lean,* 640 F.2d 534, 555 (5th Cir.1981), *aff'd in part and rev'd in part,* —— U.S. ——, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The out-of-pocket rule allows as damages "the difference between the price received and the value of the securities at the time of the fraudulent transaction." *Alley v. Miramon,* 614 F.2d 1372, 1387 (5th Cir.1980).

Though it appears straightforward, the out-of-pocket rule of *Alley* is not self-defining. Valuation of a security at the time of a conveyance may include later developments in its price. *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.1977), *citing with approval Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), and *Janigan v. Taylor,* 344 F.2d 781 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). Specifically, a defendant's profits may be disgorged where he fraudulently induces the plaintiff to sell securities to him and resells them shortly thereafter at a higher price; this despite a price "fair" by the market on the day of sale. Though it is not necessary that the fraudulent purchaser know of conditions that will shortly boost the price of the security, in this case such disgorgement only acknowledges that a fraud may encompass a skewing of the market-set price by the withholding of important pricing data, such as the willing purchaser in the wings. As recently explained by a sister court: "The early cases generally awarded the difference between the value given and the value received, but the recent trend looks to defendant's profits, rather than to plaintiff's losses, in measuring damages." *Nelson v. Serwold,* 576 F.2d 1332, 1338 (9th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978) (citing *Janigan* and *Myzel*).

*Janigan v. Taylor* pioneered the disgorgement remedy for defrauded sellers of securities. The court there recognized that a profit made by the defendant would not necessarily have accrued to the plaintiff had there been no fraudulently-induced sale.

> However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud.... It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.

344 F.2d at 786. This rule has been adopted by the Supreme Court in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1971). The Court there held:

> In our view, the correct measure of damages ... is the difference between the fair value of all that the ... seller received and the fair value of what he would have received had there been no

---

5. Scott points out that the limited partners could have discovered simply by reading their prospectuses that they had the ability to hold CSI to its lease. We could go further and say that the partners are chargeable with knowledge of this fact. Nevertheless, it is of no help to Scott because one limited partner testified that Scott had threatened to have CSI breach its obligations under the lease, and Scott himself testified that CSI had no money during this period. Though Scott's testimony on the latter point need not be credited, we will not entertain an argument by him that rests on a contrary supposition.

fraudulent conduct, *except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.*

*Id.* at 155, 92 S.Ct. at 1473 (emphasis added; citations omitted). We have recognized the force of this holding in *Huddleston, Alley,* and *Dupuy.*

A significant limitation on the disgorgement doctrine is that a plaintiff may not recover any portion of the profits attributable to the defendant's "special or unique efforts ... other than those for which he is duly compensated." *Nelson v. Serwold,* 576 F.2d at 1338 n. 3. Though the defendant might not have had an opportunity to generate these profits absent his fraud, nevertheless they cannot be deemed a windfall in the manner of profits not attributable to the defendant's entrepreneurship.

■ Here, the sale by JSA of interests in the second limited partnership followed almost immediately JSA's purchase of the interests in the first limited partnership. Consequently, the investors in the first partnership are entitled to recover the greater of the value of their interests at the moment of sale or the profit realized by JSA through the resale to the extent these profits are not attributable to Scott's entrepreneurial efforts.

Given its choice of a measure of damages, the district court understandably made no explicit finding as to either of these values, and the court's damage award—the rental payments that would have been owing over the remaining term of the lease—does not manifestly represent either one.[6] We are driven then to a remand for further findings respecting the value of the securities at the time of sale and the profit realized by JSA by the resale.

On remand the district court should assess the value of the interests held by the limited partners, recollecting that market value of the cable television assets may be a relevant consideration but does not alone

control this inquiry. Under the terms of the lease the partners had a right to future rentals regardless of whether the cable operation was profitable; however, the value of the assets would determine how much the partners would have received at the end of the 'lease term when CSI exercised its option to purchase the assets for 30% of their value in CSI stock or 18% of their value in cash. To calculate the value of the partners' rights under the option, the district court must make a reasonable estimate of the value the assets would have had in 1984 had there been no infusion of new capital that accompanied the formation of the second limited partnership.

The district court must also determine whether Scott reaped any windfall profit when he placed the cable television assets into a second limited partnership, shares of which were then sold to a second group of investors. This inquiry may be complicated by the fact that the venture was tax-driven, and the $1,350,000 pricetag attached to the assets could have no relation to the investment actually made by the new partners; even the $800,000 portion of this note that was guaranteed by the investors may be a chimera if it is offset by inflated distributions to partners or rental payments under a new lease. Additionally, any portion of the price paid by the second partnership for the assets that is attributable to improvements made by Scott to the cable system, other than the routine maintenance that he was already obliged to provide under his agreement with the first partnership, may not be included in the calculation of Scott's windfall profit. By necessity, if any profit on resale is attributed solely to Scott's efforts there will be no disgorgement of that profit.

Because the district court traveled a different path in calculating damages, its findings do not enable us to determine whether the price paid to the limited partners for their interests in Cable TV of Lebanon, Ltd. was an unfair price or whether Scott realized any windfall profit by selling the cable system assets to a second partnership. Ac-

---

**6.** The district court also allowed the plaintiffs to retain the payments made to them by JSA for their interests, lending further uncertainty to the meaning of the damage award.

cordingly, we vacate the district court's finding of injury and the damage award which followed therefrom. The award of punitive damages[7] and attorneys' fees is necessarily vacated as well. On remand, only the question of injury will be before the district court, for that able court has already found misrepresentation, scienter, reliance, and diligence, and those findings are all affirmed.

Some of these findings are sufficiently tied to the question of injury that our affirmance is to some degree contingent. If Scott paid the limited partners a fair price for their interests, it follows that he cannot have misrepresented the value of those interests, with or without scienter. In any event, the record would permit a trier of fact to infer that, in his eagerness to terminate the first partnership, Scott misrepresented the options available to the partners and which of the partners was actually the last to agree to the sale. Our affirmance of these findings should not be taken to intimate any predisposition on the question of injury or to so set the law of the case that the district court cannot look again at a finding of liability should its new damage inquiry implicate its earlier liability findings.

AFFIRMED in part; VACATED and REMANDED in part.

---

**7.** Though punitive damages are not awardable under § 10(b), they are available under the Texas Securities Act, which was also pleaded by the plaintiffs.