John F. PIDCOCK, Plaintiff–Appellant,

v.

SUNNYLAND AMERICA, INC., et al.,
Defendants–Appellees.

No. 87–8898.

United States Court of Appeals,
Eleventh Circuit.

Sept. 6, 1988.

J. Wiley Ellis, Adams, Gardner, Ellis, Inglesby & Falligant, P.C., Ronald C. Berry, Savannah, Ga., for plaintiff-appellant.

Malcolm R. Maclean, Hunter, Maclean, Exley & Dunn, P.C., Savannah, Ga., for Sunnyland.

William U. Norwood, Alexander & Vann, 218 E. Jackson St., Thomasville, Ga., for Harvard, et al.

Before TJOFLAT, VANCE and COX, Circuit Judges.

VANCE, Circuit Judge:

A fraudulent purchaser escaped 10b–5 liability in the district court on the ground that the plaintiff had failed to prove loss causation. We reverse.

## I.

Appellant John Pidcock and L.B. "Dude" Harvard, Sr. each owned fifty percent of Sunnyland America, Inc., a holding company for the ownership and operation of several meat packing plants. Dude Harvard served as president of the corporation and was actively involved in the daily operations of the meat packing companies. Pidcock served as chairman of the board, and although he attended the quarterly board meetings regularly he did not participate in the daily operations of the business.

Dude Harvard had two sons, Joe and Bryant, who both began working for Sunnyland at an early age and gradually worked their way up to management positions. In 1981 Joe was promoted from vice president in charge of sales and marketing to president of the corporation. Bryant was vice president in charge of operations. The Harvard sons' growing control over Sunnyland's operations was consistent with the desire of Dude Harvard and Pidcock that one day Joe and Bryant would take over the business.

Eventually Dude Harvard and Pidcock began to explore the possibility of selling Sunnyland.[1] Joe Harvard took responsibility for conducting all sale negotiations, including the coordination of all information relating to potential purchasers. Pidcock trusted and relied on his longtime partner's son to provide him with all material information.

After one serious prospective purchaser of Sunnyland failed to follow through with an offer, the three Harvards decided to buy out Pidcock. On October 22, 1982 Joe and Bryant met with Pidcock and formally offered to purchase Pidcock's half of the company for $2.2 million. The Harvards painted a gloomy forecast for the possibility of any third party interest in buying Sunnyland. On October 26 Pidcock wrote Joe Harvard to accept the offer. Pidcock made this decision for several reasons, including the Harvards' assurances that sale of the company to a third party was doubtful.[2] On December 21 Pidcock signed a contract for the redemption of his stock.

There were numerous conversations between Pidcock and the Harvards between the October 22 offer and the December 21 signing. Joe represented the Harvards during the negotiations. There was little direct communication between Pidcock and Dude Harvard. Pidcock made it clear that he knew he was selling his interest in Sunnyland at a bargain price. He also informed the Harvards that a possibility of selling Sunnyland to a third party would cause him to reconsider his decision to sell out, and that a likelihood of selling the company to a third party would cause him to change his decision to sell altogether. Pidcock questioned Joe Harvard repeatedly regarding the existence of an interested third party. With one minor exception,[3] Joe made no mention of any interested third parties.

---

1. Among other reasons motivating the desire to sell the company, Dude Harvard and Pidcock were concerned about the viability of a regional meat packing business and about losses sustained by Sunnyland in 1981 and 1982.

2. Pidcock also was concerned about his failing health, his desire to safeguard his wife's financial future and his faltering trust in the Harvard sons' ability to manage Sunnyland.

3. On one occasion Joe Harvard mentioned a fleeting interest shown by one third party, but characterized this interest as insubstantial.

Joe Harvard, however, was not telling the truth. In the fall of 1982, at least a month before Pidcock signed the sales contract, Joe Harvard had met with Deming Whiting, a real estate broker, to discuss the general business aspects of Sunnyland. Although this meeting had been more of an information session than a negotiation session, Joe Harvard had indicated that he would sell Sunnyland for $14 million. Joe Harvard later met again with Whiting and a financial consultant for further discussion about Sunnyland's financial condition.

In November John Sherman, a real estate broker with the Richard Tift Company, had learned of Joe Harvard's interest in selling Sunnyland. On December 10 Sherman had called Harvard and obtained permission to list Sunnyland for sale at $16 million. Six days later Sherman had called Harvard again and revealed that the Field Packing Company had an interest in Sunnyland. Joe Harvard had agreed to supply Sherman with more information about Sunnyland.

On the morning of December 21 Sherman and his senior business associate Richard Tift had met with Dude and Joe Harvard in Sunnyland's offices. After the meeting, Dude Harvard had spoken privately with Tift and asked him, as a personal favor, not to mention to Pidcock anything about the Harvards' efforts to sell Sunnyland. That afternoon, Pidcock executed the redemption agreement.

After the signing of the redemption agreement, Sherman continued to work towards the sale of Sunnyland to Field Packing. On March 30, 1983 Sunnyland and Pidcock closed on the redemption of Pidcock's shares. After the redemption the Harvards instituted a program of operational changes and improvements to Sunnyland facilities at a cost of over $1 million. Eventually Soparind Meat Packing Corporation purchased Sunnyland in January 1985 for a total of $7.3 million. In the summer of 1986 Pidcock learned from Richard Tift of Tift's December 1982 meeting with Joe Harvard.

Pidcock filed this action under Rule 10b–5 on October 1, 1986 seeking to recover the difference between the true fair market value of his stock and the $2.2 million he received.[4] Following a bench trial the district court found that had Pidcock known of the brokerage arrangement between the Harvards and the Tift Company and of Field Packing's interest in Sunnyland, Pidcock would have postponed the December 21 execution of the redemption agreement. The district court noted that Dude Harvard's request that Richard Tift not tell Pidcock about the Harvards' efforts to sell Sunnyland implied that the Harvards themselves believed that Pidcock would have reconsidered had he known of the Harvard–Tift relationship. The district court thus held that the misrepresentation or omission of this information was material under Rule 10b–5.[5] The district court also held that the Harvards made the material false representations or omissions with scienter, and that Pidcock justifiably relied on them.

The district court, however, ruled that because Soparind was not a viable purchasing prospect prior to January 1984, Soparind's purchase of Sunnyland was beyond the causal chain of events flowing from the Harvards' fraudulent conduct. The district court viewed Soparind as "a completely different purchaser, unrelated to the information withheld from Pidcock when he entered the redemption agreement." 682 F.Supp. 1563, 1580. The court therefore held that Pidcock had failed to prove proximate causation of damages. The court denied recovery under Rule 10b–5.

## II.

The district court found, and the Harvards do not contest on appeal, that Pid-

4. Pidcock calculated this amount to be as much as $3,602,395.

5. The essential elements of a 10b–5 cause of action are: (1) a false representation of a material fact (2) made with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages. *Friedlander v. Troutman, Sanders, Lockerman & Ashmore,* 788 F.2d 1500, 1503 n. 3 (11th Cir.1986); *Diamond v. Lamotte,* 709 F.2d 1419, 1422–23 (11th Cir. 1983).

cock proved the first three elements of a cause of action under Rule 10b–5. *See supra* note 5. Pidcock argues on appeal that the district court erred in granting judgment for defendants on the sole ground that Pidcock failed to establish that the Harvards' deception proximately caused him any damages.[6] Pidcock specifically argues that the district court failed to consider a line of securities cases providing that where a defrauding purchaser obtains a profit, the defrauded seller may be able to recover that profit as damages. Where this disgorgement remedy applies, Pidcock contends, the plaintiff is entitled to a presumption on the issue of proximate causation.

The traditional rule for measuring damages proximately caused by a defendant's fraud in 10b–5 actions is the difference between the value of the securities at the time of the fraudulent transaction and the price received. *Alley v. Miramon,* 614 F.2d 1372, 1387 (5th Cir.1980). The Supreme Court has held that the general measure of damages for defrauded sellers is the difference between what the seller received and what the seller would have received had there been no fraudulent conduct. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *see Dupuy v. Dupuy,* 551 F.2d 1005, 1024–25 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). Where the defrauding purchaser receives more than the seller's actual loss, however, the damages are the purchaser's profits. *Affiliated Ute,* 406 U.S. at 155, 92 S.Ct. at 1473; *see Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986).

The origin of the rule that a defrauding purchaser's profits must be disgorged is *Janigan v. Taylor,* 344 F.2d 781 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), which was cited with approval in *Affiliated Ute.* The *Janigan* court held that once it has been determined that a purchaser acquired property by fraud, any profit subsequently realized by the defrauding purchaser should be deemed the proximate consequence of the fraud. 344 F.2d at 786. The court's holding applied whether or not the profit was foreseeable. *Id.; see Falls v. Fickling,* 621 F.2d 1362, 1368 n. 15 (5th Cir.1980). In an oft-quoted passage the *Janigan* court explained:

> [I]f the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.

344 F.2d at 786; *see Siebel v. Scott,* 725 F.2d 995, 1001 (5th Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823

---

**6.** The district court concluded in its memorandum opinion:

> Despite the intent on the part of the defendants to materially mislead, and plaintiff's reliance thereon, plaintiff has not demonstrated that a single, uninterrupted causal chain exists from the defendants' failure to inform plaintiff of the brokerage agreement and the Field interest, through the securities transaction to a demonstrable injury.

> The Court sympathizes with Mr. Pidcock; it was by virtue of his financial resources and personal generosity that Dude Harvard was able to obtain half ownership in Sunnyland;

consequently, it was by virtue of plaintiff's resources and generosity that Joe and Bryant Harvard, at a tender age, began eating from a silver spoon. John Pidcock impressed the Court as being an individual schooled and seasoned on old world business ethics: his word is his contract and, when dealing with others, his cards are placed on the table. With utmost trust, Pidcock relied on business associates and apparent friends, and was deceived. He now feels betrayed, as well he should.

(Footnote omitted.)

(1984); *SEC v. MacDonald,* 699 F.2d 47, 53 (1st Cir.1983) (in banc); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 412 (3d Cir.1973), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976); *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971); *Baumel v. Rosen,* 412 F.2d 571, 575 (4th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 688, 24 L.Ed.2d 681 (1970); *cf. Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir.1976) (Sneed, Circuit Judge, concurring in part and concurring in the result in part) ("it is appropriate to require the fraudulent buyer to account for his 'ill-gotten profits' derived from an increase in the value of the stock following his acquisition of the stock").[7] The reason for this rule is simple fairness: "it is simple equity that a wrong-doer should disgorge his fraudulent enrichment." *Janigan,* 344 F.2d at 786; *see also Texas Co. v. Miller,* 165 F.2d 111, 114–15 (5th Cir.1947) ("Equity does not look with favor on the unjust enrichment of one person at the expense of another"), *cert. denied,* 333 U.S. 880, 68 S.Ct. 911, 90 L.Ed. 1155 (1948).

The *Janigan* court noted, however, that there are limits to this disgorgement principle.[8] As the Fifth Circuit explained: "A significant limitation on the disgorgement doctrine is that a plaintiff may not recover any portion of the profits attributable to the defendant's 'special or unique efforts ... other than those for which he is duly compensated.'" *Siebel,* 725 F.2d at 1002 (quoting *Nelson v. Serwold,* 576 F.2d 1332,

1338 n. 3 (9th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978)); *see Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 586 (3d Cir.1975); *see also Glick v. Campagna,* 613 F.2d 31, 36 (3d Cir.1979) ("If the defendant resells the stock at a profit, the plaintiff is entitled to the gain to the extent it was not due to special efforts on the part of the defendant").

■ Certain actions taken by defrauding purchasers after the fraudulent transaction will limit the plaintiff's recovery of subsequent profits under the *Janigan* disgorgement principle. Aggressive and enterprising management activities may break the causal chain between the fraud and the profits. *See Rochez Bros.,* 491 F.2d at 412. Extending personal guaranties on bank loans for working capital and introducing new lines of business may also preclude disgorgement. *See Myzel v. Fields,* 386 F.2d 718, 747 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).[9] Modernization also may qualify as a special effort or contribution, depending on whether or not the defendants were acting in their compensated corporate capacities. *See Nelson,* 576 F.2d at 1338 n. 3. The mere passage of time, if long enough, may limit the amount of profits recoverable by a previously defrauded seller. *See Siebel,* 725 F.2d at 1002; *see also Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1305–06 (2d Cir.1973) (discussing the effects of passage of time and of the defendant's management).[10]

---

**7.** Although the *Janigan* disgorgement principle has been applied primarily in defrauded seller situations, we do not believe it is necessarily so limited. As the Second Circuit explained: "The reason why the remedy has been applied for the benefit of defrauded sellers but not of buyers is not any decisive legal difference but the difficulty generally confronting the defrauded buyer in showing that the fraudulent seller has in fact reaped ... a profit." *Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795, 802 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *see Hackbart v. Holmes,* 675 F.2d 1114, 1122 (10th Cir.1982); *Ohio Drill & Tool Co. v. Johnson,* 498 F.2d 186, 190–91 (6th Cir.1974); *Occidental Life Ins. Co. of N.C. v. Pat Ryan & Assocs., Inc.,* 496 F.2d 1255, 1265 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974).

**8.** "If an artist acquired paints by fraud and used them in producing a valuable portrait we would not suggest that the defrauded party would be entitled to the portrait, or to the proceeds of its sale." *Janigan,* 344 F.2d at 787.

**9.** The court in *Myzel* noted, however, that such contributions may not be sufficient to escape disgorgement in a closely held corporation. *See* 386 F.2d at 747.

**10.** Another limit on the availability of disgorgement, not applicable in this case, involves publicly traded securities. "[W]hen a seller of publicly traded securities has learned of previously undisclosed material facts, and decides nevertheless not to replace the sold securities, he cannot later claim that his failure to obtain subsequent stock appreciation was a proximate consequence of his prior ignorance." *Mac-*

■ Certain events, however, are insufficient by themselves to prevent disgorgement. The *Janigan* court held that gains in the company's affairs attributable to the defendant's efforts, however extraordinary, were still subject to disgorgement if performed as part of the defendant's regular salaried responsibilities. 344 F.2d at 787; *see Siebel,* 725 F.2d at 1002. Thus price rises, increased efficiency and an improvement in the business cycle are not the kinds of events that will allow a defrauding purchaser to keep resulting profits.

■ Even more important for this case, the ending of divided control is not a valid reason for limiting the plaintiff's recovery of the defendant's profits. *See Rochez Bros.,* 491 F.2d at 412. This is particularly true when the defendants, like the Harvards, obtained undivided control of the company by the fraudulent non-disclosure. *See id.*

■ In this case we hold that the district court erred in not considering the disgorgement remedy under *Janigan* and its progeny. We further hold that Pidcock is entitled to a presumption that the damages he suffered as a result of the fraud are equal to the profits the Harvards realized upon the sale of Sunnyland to Soparind. Pidcock retains the burden of proof on the issue of damages. He is entitled to the benefit of a presumption, however, because the Harvards are in the better position to explain how the profit came about. Thus, the presumption operates so as to require the Harvards to come forward with evidence showing that the profit is attributable to causes other than their fraudulent purchase of Pidcock's interest. If they fail to come forward with such evidence, Pidcock will prevail on the strength of the presumption. If, on the other hand, they do carry their burden of going forward, Pidcock will not prevail unless he persuades the trier of fact that the explanation should not be accepted.

### III.

We therefore reverse the district court's judgment. On remand, the court shall

make new findings and conclusions consistent with this opinion. Whether further evidence should be taken is committed to the court's discretion.

REVERSED and REMANDED.