Judith LAWTON, Thomas Lawton, Marsha E. Daras, Stephen H. Lawton, Nancy J. Cronin, David T. Lawton, T. Michael Lawton, Joanna J. Lawton, and Suzanne M. Lawton, Plaintiffs,

v.

Robert NYMAN, Kenneth Nyman, and Keith Johnson, Defendants,

and

Jeffrey Nyman, Plaintiff,

v.

Robert Nyman, Kenneth Nyman, and Keith Johnson, Defendants.

Nos. 98–288–T, 02–290–T.

United States District Court, D. Rhode Island.

Feb. 15, 2005.

Joseph V. Cavanagh, Jr., Karen Ann Pelczarski, Staci L. Kolb, Blish & Cavanagh, Providence, RI, for plaintiffs.

Robert C. Corrente, William R. Grimm, Brent R. Canning, Joseph D. Whelan, Hinckley, Allen & Snyder, Providence, RI, for defendants Robert Nyman, Keith Johnson, Kenneth Nyman and Nyman Manufacturing Co., Inc.

William S. Eggeling, Joanne McPhee, Ropes & Gray, Providence, RI, for defendant Nyman Manufacturing Co., Inc.

Paul V. Curcio, James R. Oswald, Adler, Pollock & Sheehan, Providence, RI, for movant Adler Pollock & Sheehan, Inc.

Richard Donovan, Boston, MA, pro se.

### MEMORANDUM AND ORDER

TORRES, Chief Judge.

The plaintiffs in this case were minority shareholders in Nyman Manufacturing Company ("Nyman"), a closely held family corporation. They claim that they were misled into agreeing to the redemption of

their stock for less than its true value because the defendant directors and officers breached their fiduciary duty by failing to disclose that the corporation soon might be sold for an amount that would have greatly increased the value of their shares. After a lengthy bench trial, this Court found that the defendants had, in fact, breached their fiduciary duty and entered judgment for the plaintiffs. *See Lawton v. Nyman,* C.A. No. 98–288–T, 2002 WL 221621 (D.R.I. January 17, 2002) (*"Lawton I"*). This Court also made similar findings in a related case brought against these defendants by another Nyman shareholder. *See Kiepler v. Nyman,* C.A. No. 98–272–T, 2002 WL 221622 (D.R.I. January 17, 2002).

The decision in *Kiepler* has become final, but *Lawton I* was appealed and has been remanded for further proceedings on the issue of damages. *Lawton v. Nyman,* 327 F.3d 30 (1st Cir.2003).

### Background Facts

Most of the relevant background facts are recited in *Lawton I* and *Kiepler.* For present purposes, they may be summarized as follows. Nyman Manufacturing Company ("Nyman") was a closely held family corporation that manufactured paper and plastic dinnerware. Nyman's Articles of Incorporation authorized the issuance of up to 13,500 shares of Class A nonvoting stock and 1,500 shares of Class B voting stock. The company was managed by Robert C. Nyman and his brother, Kenneth J. Nyman.

In the late 1980s, Robert and Kenneth owned all of the Class B stock and nearly half of the Class A stock then issued and outstanding. The other outstanding Class A shares were owned by their children; their sisters, Judith A. Lawton and Beverly Kiepler; Judith's husband and children; a testamentary trust established by their father, Walfred Nyman; and the estate of Magda Burt, Walfred's sister. Judith, her

husband, Thomas, seven of their eight children, and Robert's son, Jeffrey, are plaintiffs in these two consolidated cases.

In August 1994, Nyman was on the verge of bankruptcy and the Nyman brothers hired Keith Johnson, an able and experienced manager, to try to turn the company around. After Johnson's arrival, business began improving and in April 1995, Johnson was granted options to purchase 1,000 shares of Nyman's Class A shares.

Shortly thereafter, the company embarked on a program to repurchase the outstanding Class A shares not owned by Robert or Kenneth. As shares were redeemed, Johnson and the Nyman brothers were awarded options to purchase them.

On May 10, 1996, the plaintiffs agreed to sell their 952 shares of Class A stock back to the company for $200 per share. At that time, Robert owned 375 of the 750 Class B shares and 1,142 of the 8,385 Class A shares issued and outstanding and Kenneth owned 375 Class B shares and 1,232 Class A shares. In addition, Robert, Kenneth, and Keith held options to purchase 1,128, 564, and 1,564 Class A shares, respectively.

Less than a month later, the defendants voted themselves options to purchase the 952 shares redeemed from the plaintiffs together with 140 Class A shares redeemed from other children of Robert and Kenneth who are not parties to these cases. Robert was awarded options to purchase 432 shares for $220 per share; Kenneth was awarded options to purchase 330 shares for $220 per share; and Keith was awarded options to purchase 330 shares for $200 per share.

At the same time, the defendants purchased the 4,115 shares of Class A stock and the 750 shares of Class B stock remaining in the corporation's treasury for $200 per share. Robert purchased 1,675 Class A shares and 375 Class B shares;

Kenneth purchased 1,250 Class A shares and 375 Class B shares; and Keith purchased 1,190 Class A shares. The defendants "paid" for the treasury shares with unsecured promissory notes totaling $973,000.

The options and the treasury shares increased the percentage of shares owned or controlled by the defendants and correspondingly diluted the ownership interests of all other shareholders.

On June 25, 1997, Van Leer Corporation ("Van Leer"), one of Nyman's competitors, signed a letter of intent (the "Letter of Intent") offering to purchase all of Nyman's outstanding stock for, roughly, $30 million. The subsequent purchase agreement (the "Purchase Agreement") provided that $1,822.96 would be paid for each Class A share or option to purchase a Class A share and 1.3 times that amount, or $2,369.85, would be paid for each Class B share. Thus, the aggregate price for all of Nyman's stock and options was fixed at $28,164,735 (the "Purchase Price"). The Purchase Agreement also permitted the defendants to buy insurance policies on their lives owned by the corporation for amounts equal to the cash value of those policies and to discharge the promissory notes that the defendants had given to purchase treasury stock by surrendering some of their Class A shares for credit of $1,822.96 per share. The agreement said nothing about whether, before being paid or receiving credit for their options, the defendants would be required to pay the exercise prices.

The closing took place on September 29, 1997. At that time, $980,383 was deducted from the Purchase Price to cover unspecified closing costs and $1,423,331 was deducted to establish an environmental escrow fund that would cover Nyman's potential liability for the cleanup of a hazardous waste site.[1] At the closing, the defendants also surrendered some of their Class A shares as payment for the balances due on their promissory notes.

### The Previous Litigation

*This Court's Prior Decision*

In *Lawton I*, this Court found that the defendants breached their fiduciary duty to the plaintiffs by failing to disclose that, when the plaintiffs' shares were redeemed, the defendants had a realistic expectation that the company soon might be sold for much more than $200 per share. 2002 WL 221621 at **15–16. This Court awarded damages in an amount equal to the difference between what it found to be the value of the plaintiffs' shares at the time of redemption and the amounts that the plaintiffs received for those shares. In calculating the value of the plaintiffs' shares, this Court took into account both the net price that Van Leer later paid for Class A shares and the fact that the value of the plaintiffs' shares had been diluted by the defendants' purchase of treasury shares, which was another breach of their fiduciary duty. *Id.* at 17*. *See Kiepler,* 2002 WL 221622 at *13.

The price paid by Van Leer was used for two reasons. First, this Court determined that the best measure of Nyman's value at the time of redemption was its "strategic value"[2] to a buyer like Van

---

1. According to the cross receipt and flow of funds statement (Ex. 328), the sum of $3,000,000 was to be placed in escrow for twelve months. However, the parties agree that $1,576,699 later was refunded to shareholders and distributed to shareholders according to the percentage of stock that they owned and that, therefore, the deduction amounted to $1,423,331.

2. Strategic value is the investment value a company may have to a particular prospective buyer because it fills a need or goal unique to that buyer. When a company has strategic value to a particular buyer, that value ordi-

Leer and that the best evidence of "strategic value" was the price that Van Leer agreed to pay approximately thirteen months later.[3] Second, this Court found that, if the possibility that Nyman might be sold had been disclosed, the plaintiffs would not have agreed to the redemption of their shares and they still would have owned the shares when Van Leer purchased the company. *Id.* at *16.

This Court also found that the amount recoverable by the plaintiffs would have been the same under a disgorgement theory because the unjust profit realized by the defendants was identical to the amount of the plaintiffs' loss. *Id.* at *17.

*The Court of Appeals' Decision*

The Court of Appeals affirmed this Court's findings that the defendants breached their fiduciary duty by failing to disclose that Nyman soon might be sold for much more than the $200 per share paid to the plaintiffs and that the plaintiffs were entitled to recover for that breach. *Lawton v. Nyman,* 327 F.3d at 41–42, 51. However, the Court of Appeals disagreed with the manner in which this Court calculated the amount to be awarded.

The Court of Appeals agreed that, in cases like this, "[t]he usual rule is to measure the plaintiffs' loss by the difference in price between what they received for their stock and its fair value at the time of sale." *Id.* at 42. It also stated that, alternatively, "[i]n appropriate cases," defendants might be required "to pay over their wrongful profits in order to avoid unjust enrichment of a wrongdoer." *Id.* at 42.

Nevertheless, with respect to the amount of the plaintiffs' loss, the Court of Appeals held that the record was insufficient to support the finding that the plaintiffs would have "retained their stock over the next sixteen months if the requisite disclosures had been made." *Id.* at 43. Specifically, it cited the absence of any express testimony by the plaintiffs to that effect and the fact that the plaintiffs did not seek any additional information regarding Nyman's financial condition or any outside advice regarding the advisability of selling their stock. *Id.* at 43–44.

In addition, the Court of Appeals questioned whether this Court's finding, that the possibility Nyman might be sold to a strategic buyer was real enough to have affected the plaintiffs' decision to surrender their shares, was inconsistent with this Court's later reference to the sale of Nyman as "a mere possibility." *Id.* at 44. Hopefully, a brief explanation will dispel any concern that these statements suggest inconsistent findings.

The finding that there was a real possibility of a sale was made in the context of holding that such possibility was sufficient to trigger a *fiduciary duty* to disclose it. By contrast, the reference to the sale of Nyman as "a *mere* possibility" [emphasis added] was made in the context of explaining why it was only a possibility and "had not yet ripened to a point at which disclosure would have been required under the *securities laws.*" *Lawton,* 2002 WL 221621 at *13 [emphasis added]. The two statements were not intended to suggest different assessments of the likelihood of a

---

narily will be greater than what otherwise would be the company's market value to non-strategic buyers. *See Lawton,* 2002 WL 221621 at *6.

**3.** Although, as the Court of Appeals noted, the sale to Van Leer did not close until September 29, 1997, approximately sixteen months

after the plaintiffs' shares were redeemed, the purchase price, essentially, had been established several months earlier during the negotiations between Van Leer and the defendants, and it was reflected in Van Leer's June 25, 1997 Letter of Intent offering to purchase Nyman's shares for $30 million.

sale. Rather, they were intended to reflect the distinction between how likely a sale must be in order to require disclosure under the *securities laws* and how likely a sale must be in order to trigger a requirement of disclosure under the more stringent standards governing *breach of fiduciary duty*. In finding no violation of the securities laws, this Court did not mean to imply that the possibility of a sale was remote or fanciful or anything less than what was required to trigger a fiduciary duty to disclose.

The Court of Appeals also held that the record did not support this Court's finding that the price paid by Van Leer was a reasonable proxy for the value of the plaintiffs' shares in May 1996 because the sale to Van Leer occurred "some sixteen months later," [4] *Lawton*, 327 F.3d at 44, and because that finding was "undercut" by this Court's determination that the "fair market value" of the plaintiffs' shares in May 1996 was $303 per share. *Id.* at 45. Hopefully, the latter concern also can be dispelled by a brief explanation.

In *Lawton I*, this Court distinguished between a company's "financial value," which is the amount that a typical buyer ordinarily would be willing to pay based on the company's prospects as a free-standing business, and the company's much greater "strategic value", which is the amount that a particular buyer, to whom the company has a unique value, would be willing to pay. *See Lawton*, 2002 WL 221621 at *9. In describing the plaintiffs' shares as having a "fair market value" of $303 per share when they were redeemed in May 1996, this Court was referring to their "financial value." As the Court of Appeals observed, this Court determined that the strategic value of the plaintiffs' shares was $2,486.59 per share based on the price that Van

Leer agreed to pay less than thirteen months later.

The Court of Appeals also pointed out that, because this Court awarded damages based on what Van Leer paid for the plaintiffs' interest in Nyman, no in-depth analysis was done with respect to the measure of recovery under the theory of unjust enrichment. *Lawton*, 327 F.3d at 46. Consequently, the Court of Appeals stated that, "[t]he measure of the damages tied to preventing unjust enrichment to defendants is not determined, nor is the issue of whether that measure is the appropriate yardstick under equitable principles to use given the facts of this case." *Id.* at 51.

Accordingly, the case was remanded to this Court for the purpose of revisiting the manner in which the amount to be awarded to the plaintiffs should be calculated.

### Previous Findings of Fact

█ Many of the factual findings relevant to determining the amount that should be awarded to the plaintiffs are set forth in *Lawton I* and *Kiepler*. The judgment in *Kiepler* has become final and this Court's findings in *Lawton I* with respect to breach of fiduciary duty have been affirmed. Accordingly, under the doctrine of issue preclusion, those findings are binding on these defendants. *Bilida v. McCleod*, 211 F.3d 166, 170 (1st Cir.2000); *see also* Restatement (Second) of Judgments § 27 (1982).

The defendants argue that the findings made in *Lawton I* and *Kiepler* must be reconsidered, at least with respect to the question of unjust enrichment. More specifically, they argue that reconsideration is required because this Court applied a preponderance of the evidence standard but the Court of Appeals has indicated that the plaintiffs must prove their case by "clear

---

**4.** As already noted, the Letter of Intent was signed by Van Leer thirteen months after the plaintiffs' shares were redeemed. *See* Note 3, *supra.*

and convincing evidence." The defendants appear to rely on language in a footnote contained in the opinion by the Court of Appeals that states:

Rhode Island law elevates the standard of proof of liability to clear and convincing evidence before a constructive trust may be imposed. Under Rhode Island law, "parties requesting the imposition of a constructive trust must establish by clear and convincing evidence the existence of fraud or breach of a fiduciary duty; absent such proof, there can be no constructive trust. In our view, a damages theory based on avoidance of unjust enrichment is not identical to the law on creation of a constructive trust. Nevertheless, a constructive trust damages theory is an option the district court may consider. If damages under Rhode Island law are to be based on a constructive trust theory, then evidence of the nature of the fiduciary duty and the fact of the breach of that duty must be clear and convincing". *Lawton*, 327 F.3d at 46 n. 13 (internal citations omitted).

■ However, the defendants' argument overlooks the fact that, in alluding to the "clear and convincing" standard, the Court of Appeals was referring only to the burden of proof for establishing a constructive trust as a remedy for unjust enrichment. The defendants fail to recognize that, as the quoted language itself indicates, imposition of a constructive trust is only one of the remedies for unjust enrichment. Disgorgement or a money judgment may be appropriate remedies for unjust enrichment, especially when the plaintiff is not seeking to recover particular property or a specific fund of money. *See Providence Steel & Iron Co. v. Flammand*, 413 A.2d 487, 488 (R.I.1980) (affirming monetary judgment of $11,000 with respect to subcontractor's unjust enrichment claim); Dobbs, *Law of Remedies 2d*, § 4.3(2) ("A decision to award the plaintiff

a recovery based on the defendant's profits, for example, is not the result of a constructive trust. Such an award is a result of a decision about the best way to remedy unjust enrichment in the particular case.").

More importantly, the defendants ignore the fact that the Court of Appeals upheld this Court's finding that they are liable for a breach of their fiduciary duty and that it remanded this case solely for the purpose of determining an appropriate remedy. If the Court of Appeals believed that the evidence regarding breach of fiduciary duty should be reconsidered, it would have said so.

In any event, even if the measure of recovery should be determined by applying principles of unjust enrichment, and even if this Court were required to "reconsider" its previous findings in order to determine whether the plaintiffs have proven by clear and convincing evidence that they would be entitled to recovery under an unjust enrichment theory, I find that they have done so.

### Further Findings of Fact

After reviewing the evidence presented during the *Lawton I* trial and considering the additional evidence presented on remand, this Court makes the following further findings of fact.

*Re Whether the Plaintiffs Would Have Sold their Stock for $200 per Share*

This Court reaffirms its finding that, if the defendants had disclosed the possibility that Nyman soon might be sold, the plaintiffs would not have surrendered their stock for the redemption price of $200 per share.

All of the plaintiffs, except T. Michael Lawton, Joanna Lawton, and Suzanne Lawton, three of Judith Lawton's children, expressly testified to that effect. They also stated that they sold their stock be-

cause of Robert's statement that the redemption presented a "once in a lifetime" opportunity to do so and because they trusted the defendants to offer a price that reflected the stock's true value. In addition, most of the plaintiffs expressed the belief that a sale of the company would have increased the value of their stock.[5] Michael, Suzanne, and Joanna, who was a minor at the time, testified that they based their decisions entirely on what their parents did; and, as already noted, their parents stated that they would not have surrendered their stock for $200 per share if they had known that the company might be sold.

All of the plaintiffs appeared to be very credible witnesses. Moreover, their testimony is made even more convincing by the circumstances surrounding their decision to surrender their stock. Thus, it was eminently reasonable for the plaintiffs to have believed that their shares had little value. The shares paid no dividends and represented a minority interest in a closely held family company that recently had experienced financial difficulties. In fact, Robert had told Jeffrey that there was no value associated with the stock.

It was equally reasonable for the plaintiffs to have believed, as Robert stated, that the proposed redemption presented a "once in a lifetime" opportunity to sell their stock. As Keith Johnson previously had told Judith, there was little likelihood that the shares could be sold to anyone other than the company. Furthermore, on at least one occasion prior to the redemption, the defendants had indicated that the company had no interest in redeeming any shares because it was financially unable to do so.

It also was reasonable for the plaintiffs to have trusted the defendants to offer a redemption price that fairly reflected the true value of their shares. Robert and Kenneth are Judith's brothers and the uncles of Judith's children. Robert also is Jeffrey's father. In addition, Keith Johnson had become a family friend who was referred to by Jeffrey as "Uncle Keith."

The defendants make much of what they say was the plaintiffs' failure to consult financial advisors and their failure to request additional financial information about the company before accepting the redemption offer. The defendants argue that such failure indicates that the plaintiffs were anxious to unload their stock at any price and would have accepted the offer of $200 per share no matter what. That argument is not persuasive for several reasons.

Judith and her husband Thomas *did* ask for advice from their family accountant who told them that the decision essentially came down to a question of whether Judith trusted her brothers.

Furthermore, given the relatively modest amounts that other plaintiffs stood to receive and the trust that they placed in the defendants, it would have been impractical for them to have incurred the expense of hiring financial advisors.[6] Finally, the evidence shows that the plaintiffs were not in any dire financial straits or otherwise under any compulsion to sell their shares at less than what they perceived to be true value.

---

**5.** That belief apparently was shared by the defendants as evidenced by the defendants' decision, one month later, to award themselves options to purchase the 1,092 recently redeemed shares and to purchase all of the company's Class A and B treasury shares for no apparent reason other than to increase their percentage of ownership. *See Lawton,* 2002 WL 221621 at **4–5.

**6.** Jeffrey Nyman and the Lawton children each owned 35 shares which, at $200 per share, provided them with a total of $7,000 apiece.

Thus, while it may be argued that some of the plaintiffs were imprudent in not making further inquiries, the evidence indicates that their failure to do so was attributable to their reliance on the defendants to offer a fair price rather than to a desperate desire to sell their stock at any price.

In any event, it is unlikely that requesting additional financial information about Nyman and/or hiring an advisor to review that information would have alerted the plaintiffs to the possibility that Nyman soon might be sold. That possibility would not have been revealed by examining Nyman's books. It was known only to the defendants who had an affirmative duty to disclose it.

*Re Whether the Plaintiffs Would Have Sold Their Stock for an Amount Greater than the Redemption Price*

The Court of Appeals indicated that one approach to determining the extent to which the defendants may have been unjustly enriched would be to calculate "the premium plaintiffs would have exacted from defendants were the relevant information disclosed." *Lawton,* 327 F.3d at 49. In this connection, the Court of Appeals identified what it termed several "unanswered and perhaps unanswerable questions" such as whether the defendants would have tendered more than $200 per share and whether the plaintiffs would have accepted a higher tender if all relevant information had been disclosed. *Id.* at 48.

■ In cases where a defendant's breach of fiduciary duty induces a shareholder to sell stock for less than its true value and the defendant later resells the stock, the measure of the defendant's unjust enrichment, generally, is the profit that the defendant realized. *Lawton,* 327 F.3d at 45; *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.1965). In cases where it is claimed that the unjust enrichment is a

lesser amount because the defendants would have offered, and the plaintiffs would have accepted something less than the price for which the stock was resold, the defendant has the burden of presenting evidence to that effect, because evidence regarding what the defendant would have done is more readily available to the defendant than to the injured shareholder. *See Pidcock v. Sunnyland America,* 854 F.2d 443, 448 (11th Cir.1988)(while defrauded seller of stock retained burden of proof on issue of damages, buyers were required to provide evidence showing that profit was attributable to causes other than fraudulent purchase of seller's interest because they were in better position to explain source of profits)

Here, Nyman was the only potential buyer for the plaintiffs' stock and there is no evidence that the defendants would have caused an offer of more than $200 per share to be made for that stock. On the contrary, the evidence shows that Beverly Kiepler rejected the tender of $200 per share for her stock and the defendants never offered her more. Indeed, Robert Nyman acknowledged that the defendants would *not* have offered her more. Because the plaintiffs would not have sold their stock for the redemption price of $200 per share if they had known that Nyman might be sold, and, because there is no evidence that the defendants would have offered or the plaintiffs would have accepted a higher price, this Court reaffirms its finding that, but for the defendants' breach of fiduciary duty, the plaintiffs still would have owned their stock when Nyman was purchased by Van Leer.

*Re Disparity in Amounts Received for Shares*

In *Lawton I,* this Court saw no need to make detailed findings regarding the manner in which the Purchase Price paid by Van Leer was adjusted and disbursed to

shareholders because this Court found that the plaintiffs should be awarded the difference between the portion of the Purchase Price attributable to their undiluted interest in Nyman and the amount that they received for their shares upon redemption. In making that calculation, it was sufficient to observe that the $28,164,735 Purchase Price for all of Nyman's stock had been reduced to a net price of $25,761,021 by deducting closing costs and the amount escrowed for possible environmental liabilities.[7]

However, those details may be relevant with respect to the issue of unjust enrichment because they show that, at the very least, the defendants received a portion of the Purchase Price that was disproportionate to the percentage of shares they owned or controlled even after awarding themselves options and purchasing treasury shares. The disproportion is attributable to the rather convoluted method by which disbursements were made for reasons which never were fully explained.

The Purchase Agreement grouped the shares and options into four categories and called for three separate closings. (Ex. 314.) The first category consisted of all of the Class B shares owned by Robert and Kenneth; some of their Class A shares; and all of the Class A shares owned by the remaining shareholders, except that none of Johnson's 650 Class A shares were included in this category. The second category consisted of 3,035 of the Class A shares owned by the defendants. The third category consisted of the defendants' options to purchase 4,348 Class A shares. The fourth category consisted of the remaining 1,162 Class A shares owned by Robert and Kenneth.

The first closing took place on September 29, 1997. At that time, the owners of

Category I shares were paid for their shares. However, they received less than the $1,822.96 per Class A share or Class A share equivalent specified in the Purchase Agreement because the amount disbursed to them, first, was reduced by the deductions of $980,383 for closing costs and $1,423,331 for the environmental escrow fund. The balance was distributed to them in proportion to the number of Category I shares that they owned.

At the first closing, Robert and Kenneth also surrendered their Category IV shares (i.e., 1,162 Class A shares) as payment for insurance policies on their lives and in return for cancellation of the $973,000 in promissory notes that the defendants had given for their purchase of treasury shares. The Court of Appeals' opinion refers to the amount paid on the promissory notes as $1,042,000, perhaps, because financial records introduced during the *Kiepler* trial indicated that the defendants also paid $69,400 in accrued interest. *Lawton*, 327 F.3d at 49 (1st Cir.2003). *See Kiepler*, 2002 WL 221622 at 14 n. 13. However, the cross receipt in evidence shows that the defendants surrendered only the number of shares required to pay the principal amount of $973,000. (Exhibit 328.)

The sum of $5,488,439 was placed in another escrow account from which, at a second closing, the defendants were to be paid for their Category II shares less the amount due for the purchase of the insurance on Keith Johnson's life. That closing was scheduled for December 30, 1997.

The sum of $7,926,243 was placed in still another escrow account from which, at a third closing, a "Rabbi trust" created by the defendants was to receive payment for their options. It appears that the defen-

7. As already noted, the escrow amount was $3,000,000. However, since $1,576,699 later was returned to shareholders, the parties agree that the net reduction of the amount received by shareholders owning Category I shares was $1,423,331.

dants were not required to pay the exercise prices on their options in order to receive credit for the full value of the shares represented by those options. That closing was scheduled for the first business day in January 1998 in an apparent effort to spread the defendants' gains over two tax years.

Because of the manner in which the method of payment for Nyman's shares was structured, the closing costs and environmental escrow funds were borne entirely by the owners of Category I shares. The defendants, who owned all of the Category II, Category III, and Category IV shares and options, were paid or credited for those shares and options in the full amount of $1,822.96 per Class A share. In addition, as already noted, the defendants were not required to pay the exercise prices on their options.

### The Remedy

The Court of Appeals' decision suggests two alternative approaches to determining the amount that the plaintiffs are entitled to recover. The first approach would be to calculate the loss or damages that the plaintiffs sustained as a result of the defendants' breach of fiduciary duty. The second approach would be to calculate the extent, if any, to which the defendants were unjustly enriched as a result of their breach.

### I. Damages

▇ As the Court of Appeals indicated, the usual measure of damages in cases such as this is the difference between the value of the plaintiffs' stock at the time of redemption and the redemption price. The Court of Appeals made it clear that, under this method, the value of the plaintiffs' shares would be a *minimum* of $303 per

share, which is what this Court previously found to be their "financial value" on June 25, 1996, one month after the redemption. *Lawton,* 327 F.3d at 49 ("In any event the *floor* of the damages plaintiffs will receive is the difference between the $200 and $303 a share on their percentage of ownership of the company in May 1996.") (emphasis added).

However, it seems clear that the plaintiffs' shares had a strategic value that was much greater than the "financial" value of $303 per share reflected in Nyman's books because thirteen months later, Van Leer agreed to pay more than six times that amount even though, as explained below, there had been no material changes in Nyman's condition. It is impossible to precisely calculate the shares' "strategic value" at the time of redemption because the Court of Appeals has said that what Van Leer agreed to pay is not an accurate proxy for that amount and because the plaintiffs have not presented any other evidence sufficient to establish what that amount was.[8]

Fortunately, there is no need to resort to inexact methods of valuing the plaintiffs' shares at the time of redemption because, as previously stated, if the defendants had not breached their fiduciary duty by failing to disclose the possibility that Nyman might be sold, the plaintiffs would have retained ownership of their stock until the Van Leer sale. Therefore, the best measure of the plaintiffs' loss is the difference between what they would have been entitled to receive for their interest in Nyman when it was sold to Van Leer and what they actually received upon the redemption of their stock.

It is well established that a plaintiff who sells stock based on a defendant's misrep-

8. The plaintiffs did attempt to show that the value of their stock at the time of redemption was more than $303 per share by presenting some evidence that a multiple of six times

EBIT (earnings before interest and taxes) sometimes is used as a rule of thumb in valuing a company. However, that evidence was not adequately developed.

resentation may be entitled to recover the difference between the sale price and the stock's fair market value on the date of sale, together with any subsequent appreciation in value attributable to the period during which the plaintiff, otherwise, would have continued to own the stock. *See Ansin v. River Oaks Furniture, Inc., et al.,* 105 F.3d 745, 758 (1st Cir.1997) (the fair value of stock that plaintiffs were induced to sell included the anticipated appreciation due to a contemplated IPO and stock split subsequent to the sale that had not been disclosed by the defendants); *Janigan v. Taylor,* 344 F.2d at 786 (a party who is induced, by fraud, to sell property may recover future accretions to the value of the property from the party committing the fraud); *Siebel v. Scott,* 725 F.2d 995, 1001 (5th Cir.1984) (the amount recoverable by a plaintiff who is induced to sell stock at an artificially low price "may include later developments in its price"); *Dupuy v. Dupuy,* 551 F.2d 1005, 1025 (5th Cir.1977) (a plaintiff who would not have sold his stock absent misinformation was entitled to the "difference between the sale price and the value of the stock at a reasonable time in the future"); *Myzel v. Fields,* 386 F.2d 718, 744–47 (8th Cir.1967) (the jury could consider subsequent appreciation of stock sold as a result of misrepresentation in determining damages).

In this case, the plaintiffs' loss was more than the difference between what they received upon the redemption of their 952 shares of Class A stock and what Van Leer actually paid for those shares. It also includes the additional amount that Van Leer would have paid for those shares if the defendants had not improperly diluted their value by purchasing treasury shares, which this Court found was a further breach of their fiduciary duty to shareholders. *See Lawton I,* 2002 WL 221621 at *17; *Kiepler,* 2002 WL 221622 at *11–12.

The dilution component of the plaintiffs' loss is illustrated by the fact that, before redemption, the plaintiffs owned 952 of the 10,135 shares of stock then issued and outstanding or subject to purchase options. Taking into account the fact that each of the 750 Class B shares was valued at 1.3 times the value of a Class A share, the plaintiffs had, approximately, a 9.2% interest in the company at that time.[9] When the Van Leer closing took place, the 952 shares formerly owned by the plaintiffs represented only a 6.2% interest in Nyman.[10] All of the diminution in value was attributable to the defendants' purchase of treasury shares.

In *Kiepler* and *Lawton I,* this Court calculated the undiluted value of each Class A share to be $2,486.59 by dividing the net Purchase Price of $25,761,021 paid by Van Leer by the 10,360 Class A shares and Class A share equivalents that would have been outstanding if the defendants had not purchased the 4,115 Class A and 750 Class B treasury shares.[11] *Kiepler,* 2002 WL 221622 at *13; *Lawton,* 2002 WL

---

**9.** The 10,135 shares included 9,385 Class A shares or options to purchase Class A shares, and 750 Class B shares. Since 750 Class B shares were the equivalent of 975 Class A shares, the total number of Class A shares and Class A share equivalents was 10,360, and the plaintiffs' 952 Class A shares were 9.2% of that number.

**10.** As a result of the defendants' purchase of treasury shares, there were 15,450 Class A shares, and Class A share equivalents outstanding at the time of the sale to Van Leer. Thus, the plaintiffs' shares represented only 6.2% of that number.

**11.** That calculation apportioned the deductions for closing costs and the environmental escrow among *all* of the shares and options, not just the Category I shares.

221621 at *16. Thus, the plaintiffs would have been entitled to a total of $2,367,233.68 for their 952 shares, a figure that is roughly confirmed by multiplying their undiluted 9.2% interest in Nyman by the net price that Van Leer paid for all of Nyman's stock and options.[12]

However, as already noted, the Court of Appeals has ruled that, in calculating per share value, the amount paid by the defendants in satisfaction of their indebtedness for the purchase of treasury stock should be deducted from the net price of $25,761,021 "to reflect the fact that Van Leer, in effect, received an immediate refund of over $1,000,000 upon purchase of the company." *Lawton*, 327 F.3d at 49.

The plaintiffs argue, and this Court respectfully continues to believe, that this Court's original calculation was correct. Since it was only the defendants who owed money for their purchase of treasury shares, their indebtedness should be deducted only from the portion of the $25,761,021 payable to them and not from the portion payable to other shareholders for their stock. Basically, that is what was done when the defendants surrendered some of their shares in order to satisfy the balances due on their promissory notes, except, however, that the value of those shares was based on the gross Purchase Price of $28,164,735 rather than the net price of $25,761,021.

Deducting the defendants' indebtedness from the net amount payable to *all* share-holders would reduce the per share price received by the plaintiffs; and, in effect, would require the plaintiffs to pay a portion of the defendants' debt.[13]

Nevertheless, despite these reservations, this Court is bound by the Court of Appeals' ruling. Accordingly, in calculating the amount that the plaintiffs would have been entitled to receive from Van Leer for their undiluted shares, this Court will use a net Purchase Price for Nyman's stock of $24,718,621. Dividing that figure by the 10,360 Class A shares, options, and Class A share equivalents that would have been outstanding if the defendants had not purchased the treasury shares, yields a value of $2,385.97 for each undiluted Class A share. Thus, after deducting the redemption price of $200 per share, the plaintiffs' loss was $2,185.97 per share.

## II. *Unjust Enrichment*

Having decided that the plaintiffs are entitled to damages equal to the amount they would have received from Van Leer for their undiluted interest in Nyman, there does not appear to be any need to calculate the amount that they would be entitled to recover under an unjust enrichment theory. Indeed, it is difficult to see how there could be any significant difference between the profits realized by the defendants as a result of the redemption and subsequent dilution of the plaintiffs' shares and the loss sustained by the plaintiffs. Nevertheless, in order to complete

---

**12.** $25,761,021 × 9.2% equals $2,370,014.

**13.** This may be illustrated by an example consisting of the following facts. A and B are the sole shareholders of the XYZ Corporation and each owns 100 shares. A and B both purchased their shares for $10 per share but A paid $1,000 in cash and B gave a promissory note for $1,000. C agrees to purchase all of XYZ's stock for $20 per share, or a total of $4,000 (i.e., 200 shares × $20/share). It seems clear that, at the closing, A should receive $2,000 and B should receive $1,000 (i.e., $2,000 less the $1,000 that B owes for the purchase of his shares). If, instead, B's $1,000 debt, first, is deducted from the $4,000 purchase price, A and B would receive $1,500 apiece, or $150 per share. Consequently, A would receive $50 per share less than C agreed to pay and a total of $500 less than the amount to which he rightfully was entitled and B, on the other hand, would get a windfall of $500.

the record and, hopefully, avoid the possibility of another remand in the event that the Court of Appeals disagrees, this Court also will address what the plaintiffs would be entitled to recover under an unjust enrichment theory.

■ As the Court of Appeals stated, unjust enrichment is a "confused area of law." *Lawton*, 327 F.3d at 47. However, one thing that is clear is that the doctrine of unjust enrichment "is based on equity and the principle that it is 'more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.'" *Id.* (quoting *Janigan*).

■ Under unjust enrichment theory, when a defendant's breach of fiduciary duty induces a plaintiff to sell stock to the defendant for less than its true value, the plaintiff is not "automatically entitled to all of defendants' profits from defendants' subsequent resale of [the] stock." *Id.* In order to be recoverable, the profit must have been "the proximate consequence of the [breach of fiduciary duty]." *Id.* at 47. Put another way, the profit must be " 'causally related' to the breach of fiduciary duty." *Id.* Among other things, that means that the plaintiff is not entitled to recover profits that represent "extraordinary gains in a company's affairs attributable to extra efforts by defendants" because that would not be part of the defendants' "windfall." *Id.* at 47–48.

■ In this case, there is a clear causal connection between the defendants' breach of fiduciary duty and the amount that they realized by reselling the plaintiffs' interest in Nyman. As previously stated, if the defendants had disclosed the possibility that Nyman might be sold, the plaintiffs would not have surrendered the shares representing their 9.2% interest in the company. Therefore, absent that breach, the defendants could not have received payment for that interest.

Ordinarily, the amount that the defendants realized would be relatively easy to calculate. It would be the difference between what the defendants received from Nyman for the 952 shares of stock redeemed from the plaintiffs and what the defendants paid for those shares, which, in this case, was nothing.[14]

However, as already noted, the 9.2% interest in Nyman that the plaintiffs' shares represented, later, was diluted by the defendants' purchase of treasury shares. Consequently, as a result of the redemption, the defendants realized an amount equal to the undiluted value of the plaintiffs' shares, which is the same amount that the plaintiffs would have been entitled to receive if their stock had not been diluted.

At the very least, the defendants received a portion of the Purchase Price that was disproportionate even to the inflated number of shares that they owned at the time of the Van Leer closing. As previously stated, the amounts that the defendants received or were credited for most of their shares were not reduced by the closing costs or the environmental escrow funds. Consequently, the defendants were paid a higher price for those shares than the price paid to other shareholders whose payments were subject to those reductions. Moreover, the inequity was compounded by the fact that the defendants' shares not subject to those deductions were counted in calculating the percentage of the $1,576,669 environmental escrow refund that the defendants received.[15] That per-

---

14. The redemption price was paid by the corporation.

15. Pursuant to Section 2.2.(c) of the Purchase Agreement, the $3,000,000 escrow was "allocated from among the consideration other-

centage was based on the number of shares that each shareholder owned rather than on the number of shares that were subject to the escrow deduction.

It would take a forensic accountant to calculate the extent to which the defendants profited from the disproportionate distribution of the Purchase Price, but there is no need to make that calculation because, as previously stated, the undiluted value of the plaintiffs' shares provides a more accurate measure of the amount that the defendants realized from the redemption of the plaintiffs' shares.

The only remaining question is whether or to what extent it would be unjust to allow the defendants to retain the amount realized from the sale of the plaintiffs' former interest. More specifically, the question posed by the Court of Appeals is whether any portion of the defendants' profits was due to an increase in the value of Nyman stock that was "extraordinary" and "attributable to extra efforts by the defendants." *Lawton*, 327 F.3d at 47.

Once a shareholder proves that a defendant's breach of fiduciary duty caused the shareholder to sell his stock for less than its true value and that the defendant resold the stock for a higher price, the defendant may be required to disgorge the profit unless the defendant presents evidence that the profit, or part of it, is not attributable to the breach. *See Pidcock v. Sunnyland America, Inc.*, 854 F.2d at 448 (because defendants are in a better position to explain how profits came about, they are required to come forward with evidence to show that profit is attributable to causes other than their fraudulent purchase of stock). *See also, Janigan v. Taylor*, 344 F.2d at 786 (when one is induced to convey property by fraud, "[i]t is more appropriate to give the defrauded party the benefit

even of windfalls than to let the fraudulent party keep them," unless there are extraordinary gains attributable to the defendant's efforts). Here, the defendants have failed to present any such evidence.

As the Court of Appeals observed, in some cases, " 'the mere passage of time, if long enough,' " *Lawton*, 327 F.3d at 48 (quoting *Pidcock*, 854 F.2d at 447), might negate the inference that the profit realized by a defendant upon resale of the plaintiff's stock resulted from the breach of fiduciary duty, whereas, in other cases, if the period of time is relatively short, it may not. *Id.* Here, the Court of Appeals found that "[t]he length of time between the repurchase of stock and the eventual sale of the company here falls at neither extreme of this temporal continuum." *Id.* at 48.

Nor have the defendants presented any convincing evidence that the increased value of Nyman's stock represented "extraordinary gains" occasioned by their "extra efforts." The defendants argue that the profits they realized were due to their efforts in engineering a turnaround of Nyman that made the company more attractive to prospective purchasers, but that argument is not convincing for several reasons.

First, profits resulting from gains in the value of a company's stock are not excluded from the amount that must be disgorged on the ground that they are attributable to the defendants' extra efforts unless those efforts occurred *after* the defendants' breach of fiduciary duty. *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 412 (3rd Cir.1974) (refusing to except from damage calculation any special efforts by management when there was "nothing in the record to indicate any

wise to be received by Sellers [for Category I stock]," but escrowed funds were refunded to shareholders based roughly on the amount of

stock held at closing. (Ex. 314 and Exhibit A to Ex. 314.)

such special efforts took place after the [fiduciary breach]"). *See Pidcock*, 854 F.2d at 447 ("aggressive and enterprising management activities" undertaken *after* a fraudulent transaction may "break the causal chain between the fraud and the profits" and so limit disgorgement). In this case, some of the initiatives cited by the defendants, such as those that involved replacing or upgrading manufacturing equipment; developing a more efficient method of removing scrap waste; and improving purchasing and market practices, were begun *before* the plaintiffs' stock was redeemed.

Second, it is difficult to see how those initiatives that *were* undertaken by the defendants after their breach of fiduciary duty could account for the difference between Nyman's "financial value" of $303 per share at the time of redemption and the per share prices paid by Van Leer which, even after the shares had been diluted, were approximately six times that amount. Some of the post redemption initiatives cited by the defendants could not have accounted for that increase because they occurred after the Purchase Price already had been established. For example, the new extruder that the defendants bought did not go online until July 1997, which was after the Van Leer Letter of Intent had been signed. Similarly, the approaches to Chinet, a Van Leer subsidiary, about cooperating in various joint ventures did not begin to bear fruit until after Van Leer acquired Nyman. Other initiatives that were undertaken between the redemption and the agreement with Van Leer produced mixed results. Thus, while the agreement between Nyman and Jaguar Industries enabled Nyman to obtain popular "quad cups" and to display its line in stores that otherwise would not have carried Nyman's products, during that same period Nyman lost BJ's, one of its largest customers, and was forced to restructure its contract with Dixie on terms less favorable to Nyman.

Third, Nyman's books do not reflect any appreciable increase in the company's value, let alone any increase attributable to the defendants' efforts. Sales, net income, and retained earnings all either remained constant or decreased slightly after the plaintiffs' shares were redeemed. Nor can any increase in value that may have occurred be characterized as "extraordinary."

Finally, actions taken by a corporate officer or director do not qualify as "extra" efforts unless they go well beyond the efforts for which the officer or director is duly compensated. *Pidcock*, 854 F.2d at 447; *Siebel*, 725 F.2d at 1002 (a defendant may retain profits only if attributable to those "special or unique efforts" for which he has not already received compensation); *Nelson v. Serwold*, 576 F.2d 1332, 1338 n. 3 (9th Cir.1978) (accretion in stock value was not due to "extraordinary contributions" where defendants "were acting in their compensated corporate capacities"). Since corporate officers and directors have a responsibility to competently manage a company's business and build value for shareholders, and, since they are compensated for discharging that responsibility, the mere performance of their duties does not qualify as an "extra" effort that allows them to retain the profit on the resale of stock that they wrongfully obtained from shareholders. *See Janigan*, 344 F.2d at 787 (holding that defendant cannot avoid disgorgement of profits attributable to efforts which were part of his regular duties as a corporate director and officer for which he received a salary); *Myzel*, 386 F.2d at 747 (defendants cannot avoid disgorgement for increase in value due to efforts as directors and officers whose responsibilities included building up the business of the company); *Pidcock*, 726

F.Supp. at 1330 (defendants who were officers and directors and well compensated for their efforts could not avoid disgorgement where increase in value was due to efforts made within the confines of their regular corporate duties).

Here, the defendants were officers and directors of Nyman and, at least after the redemption, all of them were generously compensated for their efforts. Moreover, as Robert Nyman candidly acknowledged, their duties included essentially everything involved in operating the company, managing its affairs and developing strategies to help the company grow. None of the defendants was able to identify any actions taken by them that could be described as being beyond the scope of those duties.

Nor did the defendants make any extraordinary personal sacrifices *after* the redemption that would account for any increase in Nyman's value or establish any equitable entitlement by them to any part of the profits realized on resale of the plaintiffs' former shares. It is true that, *before* the redemption, Robert and Kenneth had stepped up to the plate and guaranteed some of Nyman's debt in order to obtain necessary bank financing.[16] However, after the redemption, they arranged to have those guarantees cancelled. In addition, as majority shareholders, they received a major share of the profits realized from the Van Leer sale as well as substantial payments for employment contracts and covenants not to compete.

In short, while the defendants deserve credit for competently managing the company after the plaintiffs' shares were redeemed, their actions cannot be characterized as "extra efforts" and their actions did not produce any "extraordinary gains" in Nyman's value. Rather, the dramatic increase in the value of Nyman stock be-

tween May 1996 and June 1997, when the Letter of Intent was signed, is attributable to the fact that Nyman had a strategic value to Van Leer that was far greater than Nyman's financial value or its market value to a run-of-the-mill buyer as a freestanding business. Consequently, the defendants should be required to disgorge the entire amount that they realized upon the sale of the plaintiffs' interest in Nyman.

### Conclusion

For all of the reasons previously stated, this Court finds that the plaintiffs are entitled to recover damages from the defendants, jointly and severally, calculated in the following manner:

1. Determining the value of each Class A share by dividing the net price that Van Leer paid for Nyman's stock by the 10,360 Class A shares and Class A share equivalents (i.e., the weighted number of shares plus options) that would have been outstanding if the defendants had not purchased treasury shares; and

2. Determining each plaintiff's per share loss by subtracting from the value of each Class A share the redemption price paid to that plaintiff (i.e., $200 per share).

3. Calculating each plaintiff's total loss by multiplying that plaintiff's per share loss by the number of Class A shares owned by that plaintiff.

In addition, each plaintiff would be entitled to prejudgment interest from September 29, 1997, the date on which the plaintiffs would have received payment from Van Leer.

Based on the Court of Appeals' determination that the net price of $25,761,021 paid by Van Leer for Nyman's stock

---

**16.** Some courts have held that such guarantees do not prevent disgorgement when the

corporation is closely held. *Pidcock*, 854 F.2d at 447, n. 9; *Myzel*, 386 F.2d at 747.

should be reduced to $24,718,621 by deducting the $1,042,400 owed by the defendants on their promissory notes, judgment may enter for each plaintiff in an amount equal to the total loss shown in Table 1 plus prejudgment interest.

Table 1

| Shareholder | Number of Class A Shares | Undiluted Value of Each Share | Total Value of Shares | Amount Received upon Redemption | Total Loss |
|---|---|---|---|---|---|
| Judith Lawton | 584 | $2,385.97 | $1,393,406.48 | $116,800 | $1,276,606.48 |
| Thomas Lawton | 88 | $2,385.97 | $ 209,965.36 | $ 17,600 | $ 192,365.36 |
| Marcia Daras | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| Stephen H. Lawton | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| Nancy J. Cronin | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| David T. Lawton | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| T. Michael Lawton | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| Joanna J. Lawton | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| Suzanne M. Lawton | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| Jeffrey Lawton | 35 | $2,385.97 | $ 83,508.95 | $ 7,000 | $ 76,508.95 |
| TOTAL | 952 | | $2,271,443.44 | $190,400 | $2,081,043.44 |

Alternatively, in the event that the Court of Appeals decides that the net price paid by Van Leer should not be reduced by $1,042,400.00, this Court finds that each plaintiff should be awarded damages in an amount equal to the total loss shown in Table 2 plus prejudgment interest.

Table 2

| Shareholder | Number of Class A Shares | Undiluted Value of Each Share | Total Value of Shares | Amount Received upon Redemption | Total Loss |
|---|---|---|---|---|---|
| Judith Lawton | 584 | $2,486.59 | $1,452,168.56 | $116,800 | $1,335,368.56 |
| Thomas Lawton | 88 | $2,486.59 | $ 218,819.92 | $ 17,600 | $ 201,219.92 |
| Marcia Daras | 35 | $2,486.59 | $ 87,030.65 | $ 7,000 | $ 80,030.65 |
| Stephen H. Lawton | 35 | $2,486.59 | $ 87,030.65 | $ 7,000 | $ 80,030.65 |
| Nancy J. Cronin | 35 | $2,486.59 | $ 87,030.65 | $ 7,000 | $ 80,030.65 |
| David T. Lawton | 35 | $2,486.59 | $ 87,030.65 | $ 7,000 | $ 80,030.65 |
| T. Michael Lawton | 35 | $2,486.59 | $ 87,030.65 | $ 7,000 | $ 80,030.6 |
| Joanna J. Lawton | 35 | $2,486.59 | $ 87,030.65 | $ 7,000 | $ 80,030.65 |
| Suzanne M. Lawton | 35 | $2,486.59 | $ · 87,030.65 | $ 7,000 | $ 80,030.65 |
| Jeffrey Lawton | 35 | $2,486.59 | $ 87,030.65 | $ 7,000 | $ 80,030.65 |
| TOTAL | 952 | | $2,367,233.68 | $190,400 | $2,176,833.68 |

In the event that the Court of Appeals determines that the plaintiffs' recovery should be based on unjust enrichment principles, this Court finds that the extent to which the defendants were unjustly enriched is equal to the amounts shown as total losses in Table 1 or Table 2, depending upon whether the figure of $1,042,400 is or is not deducted from the net price for the plaintiffs' shares.

IT IS SO ORDERED.